# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **ROBERT S. WOOD,** | |
| *Plaintiff,* | |
| **v.** | **CIVIL ACTION NO.** |
| | **5:19-cv-00319-TES** |
| **CITY OF WARNER ROBINS, GEORGIA;** | |
| **Fire Chief ROSS MOULTON; and Mayor** | |
| **RANDY TOMS,** | |
| *Defendants.* | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Through this lawsuit, Deputy Fire Chief Robert S. Wood brings a bevy of claims against his employer, the City of Warner Robins, Georgia; his boss, Fire Chief Ross Moulton; and the city's mayor, Randy Toms. In Count One, Plaintiff brings claims under 42 U.S.C. § 1983 to recover for alleged deprivations of his equal protection and privacy rights under the Fourteenth Amendment against all three Defendants. [Doc. 33-1, pp. 29–32]; [Doc. 47-2, p. 1]. In Counts Two, Three, and Four, respectively, Plaintiff asserts claims for age discrimination and retaliation in violation of the Age Discrimination Employment Act, 29 U.S.C. §§ 621–634 ("ADEA"), and an age-based hostile work environment claim against the City of Warner Robins. [Doc. 33-1, pp. 32–39]; [Doc. 47-2, p. 1]. Then, in Counts Five through Seven, Plaintiff asserts a claim for intentional infliction of emotional distress; claims for privacy violations and breaches of

confidentiality related to the Health Insurance Portability and Accountability Act, 42

U.S.C. § 1320d-6 ("HIPAA"), and O.C.G.A. § 34-9-415; as well as claims for defamation,

libel, and slander against all Defendants. [Doc. 33-1, pp. 40–45]; [Doc. 47-2, p. 1].

While this case obviously has its fair share of facts, it can most succinctly be

summarized as the result of an onslaught of comments about Plaintiff's possible

retirement after other city employees accused him of drinking alcohol before arriving

on a fire scene. Defendants contend that each and every factual allegation asserted

against them is insufficient to support any of the above claims, and they have filed a

Motion for Summary Judgment [Doc. 47].

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on

the evidence presented, "'a reasonable jury could return a verdict for the nonmoving

party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002)

(quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991));

*see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears

the initial responsibility of informing the court of the basis for its motion." *Four Parcels*,

941 F.2d at 1437. The movant may cite to particular parts of materials in the record,

including, "'the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[1] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's

---

[1] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Further, where a party fails to address another party's assertion of fact as required by

Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for

purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations,

the weighing of the evidence, and the drawing of legitimate inferences from the facts

are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for
> trial. Rather, on summary judgment, the district court must accept as fact
> all allegations the [nonmoving] party makes, provided they are sufficiently
> supported by evidence of record. So[,] when competing narratives emerge
> on key events, courts are not at liberty to pick which side they think is more
> credible. Indeed, if "the only issue is one of credibility," the issue is factual,
> and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted).

Stated differently, "the judge's function is not himself to weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for

trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and

all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable

jury could make more than one inference from the facts, and one of those permissible

inferences creates a genuine issue of material fact, a court cannot grant summary

judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at

1263. So, what does the evidence in this case show?

4

## FACTUAL BACKGROUND

In February 1982, Plaintiff started working for the City of Warner Robins,

Georgia, as a firefighter, and after a series of promotions over nearly 40 years, he

became the deputy fire chief—second-in-command of the City's Fire Department. [Doc.

57-2, ¶ 1]; [Doc. 49, Wood Depo., pp. 28:19—29:17]. How Plaintiff attained this position

isn't all that important, but to provide some context, when then-Deputy Fire Chief

Moulton received his promotion to fire chief in 2016, he recommended Plaintiff for the

job. [Doc. 57-2, ¶ 3]; [Doc. 47-9, Moulton Decl., ¶ 2]. Mayor Toms approved Chief

Moulton's recommendation. [Doc. 57-2, ¶ 3]; [Doc. 47-9, Moulton Decl., ¶ 2]; [Doc. 47-

10, Toms Decl., ¶ 2]. As the deputy fire chief, Plaintiff reported to only one person,

Chief Moulton, but Assistant Fire Chiefs Christopher Cannady, David Scott Renfroe,

and George Scott Durham, reported directly to Plaintiff. [Doc. 57-2, ¶¶ 5–6]; [Wood

Depo., p. 30:11–13]; [Doc. 47-8, Cannady Decl., ¶ 2]; [Doc. 47-11, Renfroe Decl., ¶ 2];

[Doc. 47-7, Durham Decl., ¶ 2]. These individuals—Plaintiff; Mayor Toms; Chief

Moulton; and Assistant Fire Chiefs Cannady, Renfroe, and Durham (save for two more

individuals)—pretty much make up the cast of main characters for this lawsuit. Having

announced the main cast, let's get to the plot.

### "Two Beers or Not Two Beers?"

With a normal workday coming to a close on July 5, 2018, Plaintiff went home

around 5:00 p.m. [Doc. 49, Wood Depo., pp. 31:12–20; 41:7–9]. Once home, he changed

clothes to do some yardwork and testified that sometime between 5:30 and 6:00 p.m., he drank one 24-ounce beer. [*Id.* at pp. 41:20; 42:1–3; 74:23–24; 75:5–8]; [Doc. 57-2, ¶ 10]. After he finished his yardwork, he took a shower and heard a "structure fire alert" come through his work cell phone at 7:57 p.m. [Doc. 49, Wood Depo., pp. 37:24—38:1; 40:9–15; 42:7–8]. Plaintiff and Chief Moulton spoke on the phone, and Plaintiff informed him that he was "getting out of the shower" and that he "was going to head over" to the fire scene. [*Id.* at p. 42:9–13].

Driving a government vehicle, Plaintiff arrived on the fire scene at 8:18 p.m., and he made sure, via radio communications, that the on-scene shift commander, Lieutenant Lee Brantley, knew he had arrived. [*Id.* at pp. 40:13, 42:22; 43:14–25]; [Doc. 57-2, ¶¶ 11–12]. Consistent with their normal check-in routine, Plaintiff spoke with Lt. Brantley about the condition of the fire and any life-safety issues. [Doc. 49, Wood Depo., p. 44:1–7]. Here, it's important to note that Plaintiff's testimony about how the two conversed differs from Lt. Brantley's. Plaintiff testified that he was in the front seat of Lt. Brantley's fire vehicle. [*Id.* at p. 44:8–15]. Lt. Brantley, however, stated that although Plaintiff would typically get into Lt. Brantley's vehicle to speak with him, this time he didn't—this time, he spoke through the lowered passenger-side window. [Doc. 47-3, Brantley Decl., ¶ 3]. Hands down, Plaintiff disputes how his other on-scene City Fire Department colleagues characterize the rest of that evening's events. *See, e.g.*, [Doc. 57-2, ¶¶ 13–17]. And, as vehement as that dispute may be, it doesn't change the fact that their

account—their proffered testimony—is evidence that the Court may consider for determining whether Defendants are entitled to summary judgment. *See* [Doc. 57-2, ¶ 13].

Lt. Brantley stated in his declaration that Plaintiff leaned into the vehicle's passenger-side window and that he could smell alcohol on Plaintiff's breath. [Doc. 47-3, Brantley Decl., ¶ 3]. Believing that Plaintiff had been drinking alcohol before arriving at the fire scene, Lt. Brantley got out of his vehicle and found the on-scene safety officer, then-Assistant Fire Chief Dean Christian. [*Id.*]. When Lt. Brantley informed Assistant Chief Christian about his suspicions, Assistant Chief Christian told him he would look into it. [*Id.*]; [Doc. 47-5, Christian Decl., ¶ 3]. True to his word, Assistant Chief Christian did so. In addition to noticing that Plaintiff "was slurring his speech a little," Assistant Chief Christian also saw Plaintiff knock a portable radio out of another City Fire Department employee's hands. [Doc. 47-5, Christian Decl., ¶ 3]. Realizing that Plaintiff's actions were generally out of character, Assistant Chief Christian asked Plaintiff to go to his vehicle so the two of them could talk. [*Id.*]. Seated in his vehicle, Assistant Chief Christian asked Plaintiff whether he had been drinking, and even though Plaintiff replied that he had not, Assistant Chief Christian thought he caught a "faint" smell of alcohol. [*Id.*]; *see also* [Doc. 47-5, Christian Decl., p. 5]; [Doc. 49, Wood Depo., pp. 46:25—47:1; 48:24—49:2].

A little later, Assistant Chief Christian approached Lt. Brantley and informed

him that he also thought Plaintiff had been drinking before he arrived on the fire scene. [Doc. 47-3, Brantley Decl., ¶ 3]; [Doc. 47-5, Christian Decl., ¶ 3]. While discussing their perceptions of Plaintiff, they "noticed that [he] left the scene." [Doc. 47-3, Brantley Decl., ¶ 4]; [Doc. 47-5, Christian Decl., ¶ 3]. According to Lt. Brantley (who was serving as an acting assistant chief and thus, the shift commander), Plaintiff was required to notify him if he was leaving the scene as part of the City Fire Department's accountability system. [Doc. 47-3, Brantley Decl., ¶ 4]; *see also* [Doc. 47-3, Brantley Decl., p. 5]; [Doc. 49, Wood Depo., p. 45:7–8]. While Lt. Brantley stated that Plaintiff never told him he was leaving the fire scene, Plaintiff testified otherwise. [Doc. 47-3, Brantley Decl., ¶ 4]. Plaintiff says that he had already "checked out" with Lt. Brantley before he went to talk with Assistant Chief Christian, and then, after talking with Assistant Chief Christian, Plaintiff told him, "[G]ood-bye. I'll see you later." [Doc. 49, Wood Depo., p. 49:5–13].

Before Chief Moulton arrived on the fire scene around 9:30 p.m., Plaintiff had called him twice. [Doc. 47-9, Moulton Decl., ¶ 3]. First, when Plaintiff arrived on the scene, he called Chief Moulton to discuss the condition of the fire. [*Id.*]. Then, on his way home, Plaintiff made a follow-up call to Chief Moulton to "[make] him aware of the question that was asked by [Assistant Chief] Christian[]"—whether Plaintiff had been drinking before he arrived on the scene. [Doc. 47-9, Moulton Decl., ¶ 3]; [Doc. 49, Wood Depo., p. 50:7–16]; [Doc. 61, Wood Decl., ¶ 18]. In response to what Plaintiff had just told him, Chief Moulton asked the obvious—whether Plaintiff "had been

drinking[.]" [Doc. 61, Wood Decl., ¶ 18].

Once Chief Moulton arrived on the scene, he spoke with both Lt. Brantley and Assistant Chief Christian. [Doc. 47-9, Moulton Decl., ¶ 3]. According to Chief Moulton, both men informed him that they were in close contact with Plaintiff and smelled alcohol on his breath. [*Id.*]; [Doc. 47-3, Brantley Decl., ¶ 5]; [Doc. 47-5, Christian Decl., ¶ 4]. Plaintiff, interestingly, disputes that Lt. Brantley or Assistant Chief Christian could have smelled alcohol on his breath because they were not "in close contact" with him. [Doc. 57-2, ¶¶ 15, 22]. Remember though, Plaintiff's version of the events places him in the front seat of Lt. Brantley's vehicle—seemingly close—whereas Lt. Brantley's version has Plaintiff speaking through the lowered passenger-side window—possibly, not as close. [*Id.* at ¶ 22]; [Doc. 49, Wood Depo., p. 44:8–15]; [Doc. 47-3, Brantley Decl., ¶ 3]. Not that it makes any real difference, but when Plaintiff was questioned directly about his and Assistant Chief Christian's proximity, he unequivocally testified that he and Assistant Chief Christian were in "close proximity to each other." [Doc. 49, Wood Depo., p. 45:9–11]. So, it doesn't make any sense to squabble about whether Lt. Brantley or Assistant Chief Christian could smell alcohol on Plaintiff's breath because they weren't close to him. They were. Plaintiff admitted as much.[2]

After only about ten to 15 minutes on the fire scene, Chief Moulton left and went

---

[2] In any event, both Lt. Brantley and Assistant Chief Christian could testify to their beliefs and personal observations, at which point it would be up to Plaintiff to block their testimony through some evidentiary ruling or cast doubt on whether they could really smell his breath.

to Plaintiff's house to discuss Lt. Brantley and Assistant Chief Christian's allegations. [Doc. 47-9, Moulton Decl., ¶ 3]. On his way, Chief Moulton called off-duty Police Captain Todd Edwards to check his availability to conduct a possible Alco-Sensor screening on Plaintiff. [*Id.*]. Meanwhile, when Plaintiff got home at around 9:10 p.m., he started drinking another 24-ounce beer. [Doc. 49, Wood Depo., pp. 52:1–9; 74:23–24 ("The beer I drink is a 24-ounce beer.")]; [Doc. 57-2, ¶ 20]. Sometime around 9:50–10:00 p.m., Chief Moulton arrived at Plaintiff's house. [Doc. 57-2, ¶ 26]; [Doc. 61, Wood Decl., ¶ 20].

Relying on testimony from the City's head of human resources, Plaintiff makes much of the fact that Chief Moulton should have never gone to Plaintiff's house that evening. *See* [Doc. 57-2, ¶ 26]. Regardless, the Court—in presenting the facts of this case—must press on and lay out the events as they unfolded. Whether certain events should or should not have transpired and whether they may have a bearing on the outcome of Defendants' summary judgment motion are issues to be addressed down the line. For now, though, it must be remembered that summary judgment requires the Court to draw all justifiable inferences in Plaintiff's favor. *Anderson*, 477 U.S. at 255. Thus, the Court relies heavily on Plaintiff's deposition and his declaration to account for what happened next. *See generally* [Doc. 49]; [Doc. 61]. After all, what could be more favorable to Plaintiff in this instance than *his own account* of what transpired?

The first thing we need to know is how many times Chief Moulton asked

Plaintiff about drinking. The parties make a big deal about this, and for reasons that will become clearer later, it's actually pretty important to the factual development of this case.

In Plaintiff's sequence of events, Chief Moulton first asked Plaintiff "if [he] had been drinking" during that follow-up call Plaintiff made on his way home from the fire scene. [Doc. 61, Wood Decl., ¶ 18]; [Doc. 47-9, Moulton Decl., ¶ 3]. Timing-wise, Chief Moulton's question at this point could have only been concerned with whether Plaintiff had been drinking *before* the fire because Plaintiff hadn't returned home yet. "[N]o," Plaintiff responded, "because it didn't occur to [him]" that the 24-ounce beer he drank "three hours before" mattered. [Doc. 61, Wood Decl., ¶ 18]; [Doc. 57-2, ¶ 44]. Then, when Plaintiff and Chief Moulton were just outside Plaintiff's house, Plaintiff states that Chief Moulton "asked [him] if he was drinking." [Doc. 61, Wood Decl., ¶ 21]. This time, Plaintiff told Chief Moulton that he had drunk "a beer since [he] got home." [*Id.*]. Possibly to better clarify his question, Chief Moulton then "asked [Plaintiff] if [he] had been drinking *before* [he] went to the fire." [*Id.* (emphasis added)]. Again, Plaintiff denied drinking since he wasn't impaired at the fire scene and to him "'drinking' means

more than one beer."[3] [*Id.*]. Based on Plaintiff's account, after Chief Moulton arrived at Plaintiff's house, he "only asked [Plaintiff] once" whether he had been drinking before the fire. [*Id.*]; *see also* [Doc. 57-2, ¶ 27].

Chief Moulton, on the other hand, stated in his declaration that—after he got to Plaintiff's house—he asked him "on three separate occasions whether he had been drinking." [Doc. 47-9, Moulton Decl., ¶ 4]. According to Chief Moulton, Plaintiff "denied" drinking each time. [*Id.*]. At his deposition, Plaintiff even testified that he had no reason to dispute Chief Moulton's statement or his position that he asked Plaintiff whether he had been drinking three times. [Doc. 49, Wood Depo., pp. 57:15—58:4]; [Doc. 56-3, Moulton Depo., pp. 38:22–24; 39:3–4]. Suffice it to say, it's unclear exactly how many times Chief Moulton asked Plaintiff if he had been drinking, but this lack of clarity shouldn't thwart an application of logic. What is nonetheless clear is the fact that Chief Moulton asked Plaintiff whether he drank before the fire at least twice: once during Plaintiff's follow-up call to Chief Moulton after Plaintiff had left the fire scene and at least once after Chief Moulton arrived at Plaintiff's house.

With that tidbit settled, it's Plaintiff's answers to Chief Moulton's inquiries that

---

[3] Plaintiff's own perception of what constitutes "drinking" makes it even more clear that he should have answered "yes" as soon as Chief Moulton clarified his question and "asked [Plaintiff] if [he] had been drinking before [he] went to the fire." [Doc. 61, Wood Decl., ¶ 21]. Sure, Plaintiff may have only drank one physical can of beer between 5:30 and 6:00 p.m., but even he—at this point—can't deny that he was "drinking" in every sense of the word (per his own definition) since he already testified that "[t]he beer [he] drink[s] is a 24-ounce beer[,]" equal to "two 12-ounce beers[.]" [Doc. 49, Wood Depo., pp. 42:3; 74:23–24]; [Doc. 57-2, ¶¶ 19, 21]. No matter how you spin it, Plaintiff was "drinking" before he went to the fire because a single 24-ounce beer, by his own words, is "more than one beer." *Cf.* n.5, *infra*.

are more telling. Candidly, after Chief Moulton arrived at Plaintiff's house and asked him "if he was drinking[,]" Plaintiff did "make him aware that" he "had a beer since [he] got home." [Doc. 61, Wood Decl., ¶ 21]; [Doc. 49, Wood Depo., pp. 56:15—57:6]. That, of course, being after the fire. Now, with respect to Plaintiff's blanket denial after Chief Moulton attempted to clarify his question, Plaintiff testified at his deposition that he "probably should have" really told Chief Moulton that "prior to the [structure alert] two hours—now three hours ago, [he had] consume[d] one beer[.]" [Doc. 49, Wood Depo., pp. 56:15—57:6].

Around 10:30–11:00 p.m., Captain Edwards arrived at Plaintiff's house to administer the Alco-Sensor test. [*Id.* at pp. 58:5–13; 59:3–4]. Notably, despite the fact that he was at his own house, Plaintiff "did not refuse" to take it.[4] [*Id.* at p. 59:11–18]. Plaintiff says that he told Chief Moulton (prior to Captain Edwards' arrival) that any "Breathalyzer" test he took "would not be accurate" because he "had been drinking" since he returned home from the fire scene. [*Id.* at pp. 59:16—60:5; 60:24–25; 61:3–5]. Although Plaintiff never personally saw the results of the Alco-Sensor tests—yes, "tests," apparently two were administered—he testified that he did "not dispute" that they were positive for alcohol at a level of .12. [*Id.* at pp. 61:15—62:1]. After that, not

---

[4] Plaintiff's willingness to take the Alco-Sensor tests may have been due to his awareness that the City's alcohol policy includes refusal of a test as a ground for termination. [Doc. 61, Wood Decl., ¶ 22]; *see also* [Doc. 56-5, p. 169]. Based on this, Plaintiff states that he "had no choice but to blow into the Alco-Sensor tube." [Doc. 61, Wood Decl., ¶ 22].

much happened. Plaintiff and Chief Moulton discussed their next steps on how to

address the situation, and Chief Moulton instructed Plaintiff "to stay home for the rest

of the night." [*Id.* at p. 63:14–21].

## The Morning After

As discussed, Plaintiff reported to the City's Fire Department headquarters at

8:00 the next morning. [*Id.* at pp. 63:22–25; 69:2–5; 69:25—70:5]. During his and Chief

Moulton's meeting, Plaintiff admitted to Chief Moulton "that [he] had drank alcohol

prior to going on the scene, . . . [b]ut should have" clarified that, in actuality, he drank

alcohol "an hour and a half prior" (in other parts of Plaintiff's story, *see, e.g.*, [Doc. 61,

Wood Decl., ¶ 18], he says it was three hours before he went to the fire scene) to his

arrival on the fire scene. [*Id.* at p. 70:6–16]. Ostensibly, based on the events from the

previous night and Plaintiff's admission, Chief Moulton "put [Plaintiff] on sick leave"

and "suggested that [Plaintiff] reach out to the City's Employee Assistance Program[.]"

[*Id.* at p. 70:17–25]. Finally, as good record-keeping practices go, Chief Moulton

requested that Plaintiff draft a statement recounting the events from the night before.

[*Id.* at pp. 71:1–10; 74:5–8].

## Plaintiff's Written Statement and Counseling

Plaintiff began his written statement by telling Chief Moulton that it was "with

absolute dishonor" he had to write a statement due to the "choice [he] made" on July 5,

2018. [*Id.* at p. 559]. Plaintiff also wrote about his and Chief Moulton's meeting on the

morning of July 6, 2018, during which Plaintiff "admitted to [Chief Moulton] that [he] had consumed alcohol [*sic*] beverages[5] prior to responding to the structure fire . . . ." [*Id.*]. Following his admission, Chief Moulton suggested that Plaintiff call the City's Employee Assistance Program ("EAP") and "get help." [*Id.* at pp. 70:17–20; 559].

Not only did Plaintiff detail in his written statement that he spoke with EAP and made appointments as instructed, but he also told Chief Moulton that he and his counselor, Dr. Elaine Dilbeck, completed his first counseling session on July 9, 2018, to begin "treatment for alcohol and family." [*Id.* at pp. 78:17–18; 82:16–18; 559]; [Doc. 50, Dilbeck Depo., p. 30:4–13 (noting that Dr. Dilbeck's doctoral degree, along with her license as a professional counselor and several other certificates, "is a Doctorate of Education[]")]. Apparently though, Plaintiff didn't discuss alcohol in his first counseling session which is why Chief Moulton told Plaintiff that he needed "to continue to seek counseling in order to gain control over [his] issues and help for the alcohol use." [Doc. 49, Wood Depo., pp. 80:4–6; 559]. Clearly, because Plaintiff understood that Chief Moulton wanted him "to talk about alcohol[,]" Plaintiff testified

---

[5] Despite the fact that Plaintiff wrote his statement a mere eight days after the incident, he unequivocally wrote that he "admitted to [Chief Moulton] that [he] had consumed alcohol [*sic*] *beverages* prior to responding to the structure fire . . . ." [Doc. 49, Wood Depo., p. 559 (emphasis added)]. Now, at summary judgment, Plaintiff contends that Defendants' focus on his admission that he drank alcoholic "beverages" is "taken out of context." *See* [Doc. 47-1, ¶ 40] *in connection with* [Doc. 57-2, ¶ 40]; *see also* [Doc. 49, Wood Depo., p. 75:2–20]. Is it though? In an effort to shed some contextual light on what he meant by his admission that he had consumed alcoholic "beverages," Plaintiff says that the "beverages" he drank around 5:30 p.m. on July 5, 2018, were really just one—a single 24-ounce beer which is equal to "two 12-ounce beers[.]" [Doc. 57-2, ¶ 21]. Recalling footnote three, from above, Plaintiff is trying to have it both ways. *See* n.3, *supra.*

that he "turned right around" and had a second counseling session with Dr. Dilbeck "the next day." [*Id.* at p. 80:3–7]. It was during this second session that Plaintiff "talked about the incident and the alcohol." [*Id.* at p. 80:7–8].

"Most importantly," in concluding his written statement, Plaintiff expressed that he "deeply regret[ted] [his] actions[]"—his "poor decision . . . to go to that fire scene" while "not remembering [or] not thinking it was relevant" that he had drunk alcohol "an hour and a half" (or three hours) beforehand. [*Id.* at pp. 75:21—76:6; 559]; [Doc. 57-2, ¶ 44]; [Doc. 61, Wood Decl., ¶ 18]. Still "ready to accept any disciplinary actions" Chief Moulton would recommend, Plaintiff wrote at the end of his statement that he "only hope[d]" he could restore Chief Moulton's trust in him "and rejoin [Chief Moulton's] staff [to] continue to be a part of [his] vision for continued success of the Warner Robins Fire Department." [Doc. 49, Wood Depo., pp. 76:15—77:7; 559].

### Plaintiff's Discipline

Two weeks after the incident, Chief Moulton issued Plaintiff a Disciplinary Memorandum memorializing the discussions from their meeting on the morning of July 6, 2018. [Doc. 47-9, Moulton Decl., ¶ 6]; *see, e.g.*, [Doc. 47-9, pp. 17–18]. Specifically, Chief Moulton suspended Plaintiff for ten days without pay and required him to participate in EAP and undergo random drug/alcohol screenings for one year for violating four sections of City's Personnel Code and three Fire Department Standard Operating Procedures. [Doc. 47-9, pp. 17–18]. Even though Plaintiff had previously written that he

was "ready to accept" these discipline recommendations for his "poor decision," he and Defendants appear to have two very different ideas about what that "poor decision" was. *See, e.g.*, [Doc. 49, Wood Depo., pp. 75:24; 76:4].

Chief Moulton stated that Plaintiff's misconduct related to him "drinking alcohol before arriving onto a fire scene and initially lying about it when [he] asked [Plaintiff] if he had been drinking alcohol before he arrived onto the fire scene." [Doc. 47-9, Moulton Decl., ¶ 6]. Plaintiff, however, disputes "that he was disciplined for drinking alcohol before arriving at the fire scene since he was not under the influence and his [blood alcohol content] was zero."[6] [Doc. 57-2, ¶ 43]. In fact, when specifically asked about the reason for his suspension from the City Fire Department, Plaintiff testified he "never said [he] was under the influence of alcohol at the fire scene."[7] [Doc. 49, Wood Depo., p. 224:12–14]. Instead, Plaintiff "believes he was disciplined for not telling the truth when

---

[6] In support of his factual assertion that his blood alcohol content was zero, Plaintiff submitted screenshots from what appears to be an internet-based blood alcohol content ("BAC") calculator. *See generally* [Doc. 61-8]. The Court easily found the same calculator online. American Addiction Centers, https://www.alcohol.org/bac-calculator/ (last visited Feb. 2, 2022). According to the contents of his declaration and this BAC calculator, Plaintiff's weight of 248 pounds with two 12-ounce beers would place his BAC at zero. [Doc. 61-8, p. 1]. The Court is not bound to accept or rely upon what undeniably constitutes an untimely and improper attempt to present expert testimony. *See* Fed. R. Civ. P. 26(a)(2); [Doc. 71, p. 8].

[7] Of course, no one ever accused Plaintiff of "being under the influence of alcohol" at the fire. Lt. Brantley and Assistant Chief Christian only mentioned that they smelled alcohol, and Assistant Chief Christian asked Plaintiff if he had been drinking before he got to the fire scene. [Doc. 47-3, Brantley Decl., ¶ 3]; [Doc. 47-5, Christian Decl., ¶ 3]. Chief Moulton asked him the same thing. [Doc. 47-9, Moulton Decl., ¶ 3]. Plaintiff's assertion that he "wasn't under the influence" is nothing more than the classic red herring, but whether he was, may have a huge bearing on some of his state law claims. *See* nn. 20, 23, *infra*.

Chief Moulton initially asked whether he had a drink."[8] [*Id.*]. So, circling back to the Court's earlier focus on Chief Moulton's questions about whether Plaintiff had been drinking before he arrived at the fire scene and Plaintiff's ultimate deposition testimony that he "probably should have" really told Chief Moulton that he had "consume[d] one [24-ounce] beer[]"prior to the structure fire alert, Plaintiff admits that he didn't tell Chief Moulton the truth. [Doc. 49, Wood Depo., pp. 56:15—57:6]. Thus, by drawing the reasonable inference in Plaintiff's favor based on *his own account* of what transpired, the Court accepts Plaintiff's belief that "he was disciplined for not telling the truth." *Anderson*, 477 U.S. at 255; [Doc. 57-2, ¶ 43].

As planned, Plaintiff served his unpaid suspension and was on leave from July 20, 2018, through August 2, 2018. [Doc. 57-2, ¶ 48]; [Doc. 49, Wood Depo., p. 70:17–25]. On July 25, 2018, Chief Moulton issued Plaintiff a Final Notice of Disciplinary Action. [Doc. 57-2, ¶ 47]; [Doc. 47-9, p. 44]. Although Plaintiff had the right to appeal his discipline, he states that he didn't because Chief Moulton led him to believe that any appeal would be "fruitless" as the appealing body—City Council—had already voted to approve his discipline. [Doc. 57-2, ¶ 47]; [Doc. 61, Wood Decl., ¶¶ 32–33]. Even though Plaintiff and Defendants disagree on many things, at least they all agree that "Plaintiff's

---

[8] Phrased a little differently, Plaintiff also insists that his "misconduct was simply not remembering and/or not thinking it relevant that he had a 24-ounce beer almost three hours prior to the fire scene." [Doc. 57-2, ¶ 41]; [Doc. 61, Wood Decl., ¶ 18]. Or, an hour and a half prior, as it were. [Doc. 49, Wood Depo., p. 70:6–16].

age" when it comes to his Section 1983 and ADEA claims "does not come into play until after his discipline." [Doc. 57-2, ¶ 49].

### A Local Citizen's Facebook Post

On August 1, 2018, David Reid, a local citizen who operates a Facebook page called "Enough is Enough in Warner Robins" contacted Mayor Toms by phone and informed him that "it was his understanding that Plaintiff arrived onto a fire scene under the influence of alcohol and was allowed to leave the scene." [*Id.* at ¶ 56]; [Doc. 49, Wood Depo., p. 102:4–6]. Mayor Toms testified that he could "neither confirm nor deny" Reid's comments about Plaintiff's incident and "did not tell . . . Reid anything about what [Plaintiff] did or anything that happened to him as a result." [Doc. 56-4, Toms Depo., p. 47:2–10]; [Doc. 47-10, Toms Decl., ¶ 4]. And while that may be true, summary judgment doesn't permit the Court to accept that version of events (or Reid's wavering version) over Plaintiff's account of what was said between Mayor Toms and Reid during their phone call. *Anderson*, 477 U.S. at 255. According to Plaintiff, when Chief Moulton called him to warn him that the incident from the fire scene "might get

out," Chief Mouton told Plaintiff a slightly different story.[9] [Doc. 57-2, ¶ 66]. Apparently, after leaving the mayor's office (from what appears to be just a run-of-the-mill visit), Chief Moulton called Plaintiff and told him that while Mayor Toms was on the phone with Reid, he confirmed the events from the fire scene, confirmed a positive alcohol test, disclosed Plaintiff's participation in EAP, and said that Plaintiff would "serve [his] suspension and retire." [Doc. 49, Wood Depo., pp. 102:4–12; 102:24—103:2]; [Doc. 56-4, Toms Depo., p. 46:8–23]; [Doc. 61, Wood Decl., ¶ 40 ("Chief Moulton informed [Plaintiff] that [Plaintiff's] disciplinary action, a positive alcohol test, and EAP participation were also discussed.")]; [Doc. 57-2, ¶¶ 60, 67].

Later that day, Reid made a post on the "Enough is Enough in Warner Robins" Facebook page detailing what Mayor Toms had supposedly just confirmed regarding Plaintiff. [Doc. 57-2, ¶ 70]; [Doc. 49, pp. 437, 440]. Specifically, Reid wrote that "Plaintiff had been suspended for driving a [government] vehicle while under the influence of alcohol, . . . [had] entered into the City's EAP, and that he would serve his suspension and then retire." [Doc. 57-2, ¶ 70]; *see, e.g.*, [Doc. 49, p. 437]. While Mayor Toms clearly

---

[9] This is, of course, Plaintiff testifying as to what someone else—Chief Moulton—said. Thus, Plaintiff's account of what happened may be textbook hearsay, and Plaintiff certainly wouldn't be able to testify at a trial as to what Chief Moulton told him regarding Mayor Toms and Reid's phone call. Chief Moulton, however, certainly could testify as to what he told Plaintiff. If Chief Moulton's out-of-court statements are introduced to show their effect on the listener, rather than to prove the truth of the matter stated, then they are not hearsay. Fed. R. Evid. 801(c); *see United States v. Harris*, 886 F.3d 1120, 1129–30 (11th Cir. 2018); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) ("[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.").

testified otherwise, Reid's Facebook post says that the information contained in it was "100 percent . . . true" and "verified *via the mayor* [from] a phone conversation [Reid] had with" the mayor earlier that day.[10] [Doc. 49, pp. 437–38 (emphasis added)]; [Doc. 56-4, Toms Depo., p. 47:2–10]; [Doc. 47-10, Toms Decl., ¶ 4]. Curiously though, when providing his declaration to aid Defendants in their summary judgment motion, Reid stated that he "inadvertently wrote that certain information [he] received about [Plaintiff] was confirmed by Mayor Toms." [Doc. 47-15, Reid Decl., ¶ 4]. In what is an obvious effort to walk back his story, Reid now states that "Mayor Toms never confirmed anything to [him] about [Plaintiff] and what happened at th[e] fire scene[.]" [*Id.*]. With this about-face, Reid's account now conveniently aligns with Mayor Toms'— that Mayor Toms "only told [Reid] that he could neither confirm nor deny" Reid's comments about Plaintiff's incident. [*Id.*].

Here's the catch though: Reid already had most of the story even before talking to Mayor Toms. It was a proffered fact by Defendants and undisputed by Plaintiff that when Reid contacted Mayor Toms by phone, Reid told him that "*it was his understanding* that Plaintiff arrived onto a fire scene under the influence of alcohol and was allowed to leave the scene." [Doc. 57-2, ¶ 56 (emphasis added)]. What does that mean? What it

---

[10] Clearly, Mayor Toms said more than "I [can] neither confirm nor deny" to Reid during their phone conversation because Mayor Toms states in his declaration that "[a]t some point" Reid flat out asked him if Plaintiff "was going to retire[.]" [Doc. 47-10, Toms Decl., ¶ 4]. In response, Mayor Toms told Reid, based off what somebody else had previously told him, that it was his belief that Plaintiff was going to retire. [*Id.*].

means is that Mayor Toms didn't let the cat out of the bag about Plaintiff's incident. Reid had already come about the information by other means. Somehow, through someone, Reid came to know the specifics of not only what happened at the fire scene and at Plaintiff's house afterwards but also about the specifics regarding Plaintiff's discipline. On this, the parties agree that what Reid knew didn't come from any social media post about the incident by any city employee or elected official. [*Id.* at ¶ 73].

Bottom line, Reid's post on the "Enough is Enough in Warner Robins" Facebook page is pretty detailed for someone who was simply told that "[his] understanding" "could neither be confirmed nor denied." [Doc. 47-15, Reid Decl. ¶¶ 3–4]. Should a jury have to decide which versions of Reid's account it believes, *Sconiers*, 946 F.3d at 1263, and to the extent they are relevant to resolving certain state law claims asserted by Plaintiff, the Court can confidently say that his Facebook post says what it says. It unequivocally hints at mayoral confirmation several times.

- "This information is 100 percent *verified* and is true."

- "I have made calls and have *verified* this completely, it is not an accusation."

- "[T]he story was written is *verified via the mayor* and a phone conversation I had with him today."

- "As far as a breath test number, I do not know, the [m]ayor only *confirmed* a positive test result."

[Doc. 40, pp. 437–41 (emphasis added)].

　　　　Once Plaintiff found out about Reid's Facebook post, Plaintiff sent a text message

to Chief Moulton telling him that his "[n]ame [was] out there[.]" [Doc. 57-2, ¶ 74]; [Doc. 49, p. 588]. In other words, as Chief Moulton feared, the incident had gotten out. The very next day, Chief Moulton emailed the entire City Fire Department stating that he had handled the matter "in a professional manner[] and that fair and firm action was taken to deal with the situation."[11] [Doc. 49, p. 590].

## Plaintiff Returns to Work After His Suspension

All of the events leading up to this point no doubt set the stage for what's to come, but here's when Plaintiff's age allegedly becomes relevant. [Doc. 57-2, ¶ 49]. On August 3, 2018, Plaintiff returned to work at the City Fire Department. [*Id.* at ¶ 76]. Plaintiff testified that as soon as he walked through the door that morning, Chief Moulton told Plaintiff that he was "old enough to retire" and that he wanted him "to retire." [*Id.* at ¶ 77]; [Doc. 49, Wood Depo., p. 123:20–22]. And, according to Plaintiff, Mayor Toms shared this sentiment. [Doc. 57-2, ¶ 77]; [Doc. 49, Wood Depo., p. 123:20–23]. As shocking as these comments may have been to Plaintiff, he admits that he didn't ask Chief Moulton to explain why he made them. [Doc. 49, Wood Depo., pp. 124:20—125:6]. Plaintiff did, however, testify that once the perceived age-related harassment began, Chief Moulton "brought up that [he] wanted [Plaintiff] to leave . . . because of

---

[11] While Plaintiff can't possibly dispute that Chief Moulton sent this email, he does dispute Chief Moulton's opinion or characterization that he handled Plaintiff's incident in a professional manner. [Doc. 57-2, ¶ 74]. According to Plaintiff, this type of email—one disclosing an employee's name and discipline—has never been sent out "[i]n all the years" Plaintiff has been employed with the City Fire Department. [*Id.* at ¶ 75]. While that may be absolutely true, nothing like this had happened with a deputy chief before either.

th[e] incident." [*Id.*]; *see* n.13, *infra*.

Even though Plaintiff signed, agreed to, and served his discipline, he testified that Chief Moulton wanted him to "write an email to the [City Fire Department] taking responsibility for [his] actions." [Doc. 49, Wood Depo., pp. 125:12–13; 129:10–12]. Since writing an email wasn't part of Plaintiff's disciplinary agreement, he found it "odd" that Chief Moulton wanted him to write one. [*Id.* at p. 129:12–13]. Nevertheless, as Chief Moulton's subordinate and because it was his first day back from suspension, Plaintiff didn't refuse to send the email. [*Id.* at p. 129:14–22]; *see also* [Doc. 57-2, ¶ 79]. Here's what he wrote:

> To All:
>
> Thank you to Chief Moulton for his communication regarding the incident last month. As Chief stated, I have abided by discipline and guidance of our department and city management. I sincerely regret anything that takes away from the mission statement of our department and service to the Warner Robins community.
>
> I am grateful to be a part of the Warner Robins community and a member of this department. It is with heartfelt love and respect for the Warner Robins Fire Department and the brotherhood of the WRFD community that I thank you all for your support.
>
> As Chief stated, "We will get through this together, and I appreciate your support and prayers."
>
> Respectfully,
>
> Chief Wood

[Doc. 49, p. 596].

The supporting characters within the City Fire Department's community are the three individuals who report directly to Plaintiff—Assistant Fire Chiefs Cannady, Renfroe, and Durham. [Doc. 57-2, ¶¶ 5–6]. Defendants contend that these three men "were aware that Plaintiff had been out of work for a period of time and had read on social media that [he] had arrived onto a fire scene after drinking alcohol," but they also take the position that neither Chief Moulton nor Mayor Toms told them anything about Plaintiff's incident or his subsequent discipline. [*Id.* at ¶ 81]. Plaintiff disputes that each of the three men were not aware of his discipline. [*Id.*]. For example, Assistant Chief Durham stated in his declaration that "[d]uring a staff meeting in July 2018," Chief Moulton "informed [him and Assistant Chiefs Renfroe and Cannady] that [Plaintiff] would be *out of work* for approximately two weeks." [Doc. 47-4, Durham Decl., ¶ 3 (emphasis added)]; *see also* [Doc. 47-8, Cannady Decl., ¶ 3]; [Doc. 47-11, Renfroe Decl., ¶ 3].

Plaintiff, however, contends that deposition testimony from Assistant Chief Durham tells a different story. *See* [Doc. 57-2, ¶¶ 50, 81]. To support his position, Plaintiff directs the Court to Assistant Chief Durham's deposition. *See generally* [Doc. 56-1]. Assistant Chief Durham testified that he was "aware"—because of what Chief Moulton told him—that "[Plaintiff] was on a *disciplinary suspension*." [Doc. 56-1, Durham Depo., p. 14:5–14 (emphasis added)]. There is a big difference between Assistant Chief Durham's knowledge that Plaintiff was going to be "out of work" for

25

some undescribed reason, as opposed to him knowing that Plaintiff was going to be out of work because of a "disciplinary suspension." [Doc. 47-4, Durham Decl., ¶ 3] *in connection with* [Doc. 56-1, Durham Depo., p. 14:5–14]. Assuming Chief Moulton *did* tell the three assistant chiefs that Plaintiff was out of work due to his disciplinary suspension, that disclosure—while obviously not ideal, in Plaintiff's opinion—has no bearing on the federal claims addressed by the Court.

What's factually important for Plaintiff's claims is that Chief Moulton wanted the three assistant chiefs to talk to Plaintiff when he returned from his suspension. [Doc. 49, Wood Depo., p. 135:11–13]. About what, though? Plaintiff testified that he "had no idea that Chief Moulton expected [him] to talk to these three [assistant chiefs] about th[e] incident because they're [Plaintiff's] subordinates." [*Id.* at p. 135:14–17]. However, the incident is exactly what Chief Moulton wanted them to discuss with Plaintiff. [*Id.* at p. 135:14–18]. Based on Plaintiff's recollection, the three assistant chiefs were "instructed by Chief Moulton to have a meeting with [Plaintiff] to tell [him] to—pretty much to leave, get out of here, to retire." [*Id.* at p. 140:11–14].

On August 7, 2018, two days after Plaintiff sent his email to the City Fire Department, Plaintiff met with Assistant Chief Cannady, and the two basically discussed how to "move forward from this." [Doc. 49, Wood Depo., pp. 133:21–23; 135:19—136:1]; [Doc. 57-2, ¶ 82]. While Assistant Chief Cannady may have "asked [Plaintiff] what his intentions were" when it came to staying with the City Fire

Department, he never told Plaintiff that he was "getting too old to do [his] job[]" or that he need[ed] to leave." [Doc. 47-8, Cannady Decl., ¶ 4]; [Doc. 49, Wood Depo., p. 136:22–24]. However, during their conversation, Assistant Chief Cannady admits that because of "rumors that [Plaintiff] might retire[,]" he "want[ed] to know whether [Plaintiff] intended to stay" with the City Fire Department. [Doc. 47-8, Cannady Decl., ¶ 4]. Plaintiff, on the other hand, is adamant that Assistant Chief Cannady told him that "[h]e thought it would be best for [Plaintiff] to retire." [Doc. 49, Wood Depo., p. 135:22–23].

The next day, Plaintiff met with Assistant Chief Renfroe who referred Plaintiff to an article in which a fire chief, from another fire department, voluntarily left his employment after he was disciplined for arriving onto a fire scene under the influence of alcohol. [Doc. 57-2, ¶ 87].[12] Assistant Chief Renfroe apparently used that article as a means to tell Plaintiff that "for the best of the department, that chief left." [Doc. 49,

---

[12] In his response to Defendants' Statement of Material Facts, Plaintiff disputes Defendants' position regarding the referenced article about the fire chief from another department on the grounds that Assistant Chief Renfroe referenced the article "in an animated fashion." [Doc. 57-2, ¶ 87]. The Court read and re-read the cited testimony from Plaintiff's deposition that his attorneys used to dispute this fact, and nowhere, nowhere at all does it even *hint* that Assistant Chief Renfroe referred to the article "in an animated fashion." *See* [*id.*] *in connection with* [Doc. 49, Wood Depo., pp. 139:8–15; 140:2—142:9]. To the contrary, Plaintiff's testimony was simply that Assistant Chief Renfroe "just referenced the article." [Doc. 49, Wood Depo., 141:9–10]. The Court views this as nothing more than Plaintiff and his counsel attempting to effectively add testimony to a deposition and to interject baseless and, candidly, unnecessary accusations into the record so they can rely on them for their own gain. This is not how you create a question of fact. It goes without saying that the Court extremely disfavors such blatantly improper practices, and as such, these tactics only serve to damage their credibility with the Court. Rule 11 is made to deal with these circumstances, and the Court will continue to consider whether to order Plaintiff and his counsel to show cause as to how they have not violated it.

Wood Depo, p. 140:17–21]. Despite his intentions, Plaintiff took Assistant Chief Renfroe's attempt "to relate [Plaintiff's] incident to someone else's" as more pressure that "[Plaintiff] need[ed] to retire." [*Id.* at p. 141:16–18; 141:24].

As for Assistant Chief Durham, he and Plaintiff met on August 9, 2018. [Doc. 57-2, ¶ 92]. Their conversation, according to Plaintiff, was anything but cordial. Plaintiff testified that Assistant Chief Durham raised his voice at him and told him that he was "old enough to retire[,]" that he "should retire[,]" and that "he should be 'ashamed' of his actions at the fire scene." [*Id.* at ¶¶ 91–92]; [Doc. 49, Wood Depo., pp. 138:17–25; 144:12–14]. On top of that, Plaintiff testified that Assistant Chief Durham said, "I'd feel sorry for you if . . . you didn't have retirement. You need to get on. You need to retire." [Doc. 49, Wood Depo., p. 145:17–19]. Even with this seemingly heated conversation, Plaintiff testified that Assistant Chief Durham "never said [Plaintiff] w[as] too old to do [his] job." [*Id.* at p. 139:1–3]. After this, Assistant Chief Durham and Plaintiff didn't have any further discussions about Plaintiff's employment with the City Fire Department. [Doc. 57-2, ¶ 96]. However, when Chief Moulton learned how Assistant Chief Durham spoke to Plaintiff, Chief Moulton informed Assistant Chief Durham "that he should not raise his voice to [Plaintiff] anymore[.]" [*Id.* at ¶ 94]; [Doc. 47-9. Moulton Decl., ¶ 14].

Then, on August 10, 2018, Plaintiff met with Chief Moulton again. [Doc. 57-2, ¶ 97]. During this conversation, Plaintiff testified that Chief Moulton "kept constantly telling" him that he "needed to leave, retire[]" and that if Plaintiff "cared about" him,

"[he] needed to leave." [*Id.*]; [Doc. 49, Wood Depo., pp. 148:22—149:7]. Even though retirement was never mentioned as part of Plaintiff's discipline, Chief Moulton, in order to protect Plaintiff's reputation as well as the City Fire Department's, did "express his opinion to Plaintiff . . . that it would be better if Plaintiff left[.]" [Doc. 57-2, ¶ 98]. Importantly, in his testimony, Plaintiff was clear that Chief Moulton's urging him to leave the City Fire Department wasn't "because of [Plaintiff's] age." [Doc. 49, Wood Depo., pp. 125:4–6; 150:2–4]. Instead, Plaintiff testified that Chief Moulton told him that he wanted Plaintiff to leave "because of his actions surrounding" the incident.[13] [Doc. 57-2, ¶ 99].

Generally speaking, when looking at Plaintiff's testimony, two major points need to be highlighted. First, he believes that none of his fellow firefighters would have asked him to leave the City Fire Department had the incident not occurred. [*Id.* at ¶ 100]. And second, he believes that they wouldn't have wanted him to leave had he not been retirement eligible. [Doc. 49, Wood Depo., p. 146:11–14]. While Plaintiff's conversations and interactions with Chief Moulton and Assistant Chiefs Durham, Renfroe, and Cannady undoubtedly add to the plot for his Section 1983 and ADEA claims, this case, factually, is just now at intermission. So, let's move on to the second act.

---

[13] While it may not be clear just yet, Plaintiff being urged to leave the City Fire Department "because of his actions" is very different than him being urged to leave "because of [his] age."

**Local News Stations Submit Open Records Act Requests**

On August 2, 2018, the day before Plaintiff returned from his suspension but the day after Reid made his Facebook post, former 13WMAZ news reporter, Zach Merchant, submitted an Open Records Act ("ORA") request to the City of Warner Robins under the Georgia Open Records Act. [Doc. 47-4, McKinzie Decl., ¶ 3]; [Doc. 57-2, ¶¶ 56, 76, 102]. Merchant's ORA request was two-fold. First, via email to Amy McKinzie, the Record Clerk for the City of Warner Robins, he sought "[a]ny police reports, incident reports, drug or alcohol test results, disciplinary documents, drug or alcohol treatment or rehabilitation admittance forms or any other documentation relating to [Plaintiff] over the last fourteen days[.]" [Doc. 47-4, p. 8]; [Doc. 47-4, McKinzie Decl., ¶ 2]. Then, a few hours later, he emailed McKinzie again, and added "any emails, text messages, or other forms of documented communication regarding [Plaintiff] during that time period[]" to his ORA request. [Doc. 47-4, p. 8].

Five days later, McKinzie responded to Merchant's ORA request, and submitted several documents "subject to any and all applicable exemptions provided under the Georgia Open Records Act[.]" [Doc. 57-2, ¶ 103]. Not only were these documents unredacted, disclosing Plaintiff's identity, but some of them mentioned alcohol treatment and participation in the City's EAP. *See, e.g.*, [Doc. 47-4, pp. 11–12, 15]. This disclosure, according to Plaintiff, poses more legal problems for Defendants when it comes to his state law claims. [Doc. 57-2, ¶ 103]; [Doc. 33-1, pp. 42–44].

Merchant set up an interview with Chief Moulton on August 8, 2018. [Doc. 57-2, ¶ 105]. During his interview, Chief Moulton told Merchant that Plaintiff's incident was a "black eye" for the City Fire Department, that Plaintiff's conduct was not acceptable, and that the discipline administered to him was fair given his rank and tenure. [*Id.* at ¶ 106]. Using the documents McKinzie submitted to him as well as the information gleaned from his interview with Chief Mouton, Merchant wrote an article about Plaintiff and the events from July 5, 2018. [*Id.* at ¶ 105].

About two weeks later, on August 21, 2018, former WGXA reporter, Clair Helm, emailed McKinzie informing her that "WGXA [wanted] to make an open records request regarding a Warner Robins firefighter who allegedly went to a scene while intoxicated." [*Id.* at ¶ 107]; [Doc. 47-4, p. 36]. Also included in Helm's attached ORA request was an attempt to confirm that "this individual was in fact intoxicated[.]"[14] [Doc. 47-4, p. 36]. On August 23, 2018, McKinzie responded to Helm's ORA request, but like her response to Merchant's, the submitted documents were unredacted. [Doc. 57-2, ¶ 108]; [Doc. 47-4, McKinzie Decl., ¶ 6].

## Plaintiff Files a Formal Grievance

The City's Employee Handbook instructs employees who wish "[t]o file a formal grievance" to "stat[e] with specificity the essence or nature of the grievance, the exact

---

[14] McKinzie did not directly respond to Helm's inquiry about whether Plaintiff was "in fact" intoxicated. *See* [Doc. 47-4, pp. 36, 51].

date and time of the grievance, and the party or parties involved." [Doc. 57-2, ¶ 110];

[Doc. 49, p. 780]. To make sure he did it correctly, Plaintiff consulted with the City's

Human Resources Director, Toni Graham, before he filed his formal grievance. [Doc. 49,

Wood Depo., pp. 158:25—160:7]. As she suggested, Plaintiff verbally informed Chief

Moulton that he planned to file a formal grievance against him and Assistant Chiefs

Cannady, Renfroe, and Durham "the next day." [*Id.* at pp. 159:19—160:2]. According to

Plaintiff's testimony, Chief Moulton responded, "I wish you wouldn't do that." [*Id.* at p.

160:3–4]. Then Plaintiff said, "You give me no choice. You keep doing what you're

doing. I've already asked you to stop." [*Id.* at p. 160:5–7]. On August 21, 2018, Plaintiff

properly submitted his formal grievance to the mayor's office. [*Id.* at pp. 599 (stamped

"RECEIVED" at "9:47 a.m." on August 21, 2018), 780 (indicating that a formal grievance

"shall be presented to the [m]ayor's office where it shall be stamped with the date and

time received")]; [Doc. 57-2, ¶ 117]. Here's most of it.

> August 1, 2018 – phone call from Chief Moulton letting me know that he
> had been in the mayor's office when the mayor was on the phone with
> [Reid] from Enough is Enough Facebook page. According to Chief Moulton,
> Mayor Toms told [Reid] I would serve my suspension and retire. I informed
> Chief Moulton that was not what was agreed upon, I had served my
> suspension, and I was not going to retire. Chief Moulton told me this may
> get out. Later that evening, information about me was posted on Enough is
> Enough Facebook page.
>
> August 2, 2018 – email from Chief Moulton to entire fire department
> regarding my discipline related to alcohol.
>
> August 3, 2018 – A.M.: HARASSMENT BEGAN when I returned to work
> after suspension. Chief Moulton told me Mayor Toms wants me to decide

to retire and he (Chief Moulton) wants me to retire. I informed Chief Moulton that was not what was agreed upon, I had served my suspension, and I was not going to retire. DISCRIMINATION: I informed Chief Moulton I was aware of a similar incident with an officer who served only three days suspension and that incident did not get out. Chief Moulton told me that was different.

P.M.: MORE HARASSMENT: Chief Moulton told me he wants me to retire. Chief Moulton told me he met with Mayor Toms and Mayor Toms wanted him to put me on administrative leave. Chief Moulton told me he told the mayor he was not going to do that. He also stated he didn't think the mayor could legally do that. Chief Moulton stated, I have had to fight the mayor since the day I promoted you. I stated to Chief Moulton I do not intend to retire. I was disciplined and served by suspension and confirmed with both he and [Graham], Human Resources Director, that when I signed the discipline papers that serving my suspension would be the end of it with a return to work on August 3, 2018. Chief Moulton stated I needed to think about retiring and doing what is best for the department. Chief Moulton said, if you care about me, you'll retire. He asked me to go home and think about it over the weekend. He also referenced him telling me to send out an email to the department addressing the issue of my discipline and scheduling with shift commanders to go to the stations and apologize to the firefighters.

August 5, 2018 – As directed from Chief Moulton, I sent out an email to the department.

August 6, 2018 – MORE HARASSMENT: a.m. Chief Moulton was not happy with the email I sent out. He also stated he wanted me to retire. He also stated the mayor fought promoting me and wants me to retire. Chief Moulton stated I needed to apologize to everyone in the department and tell them I am sorry. I told him an apology is best when it's face to face. As directed by Chief Moulton, I spoke with [Assistant] Chief Durham about speaking with the firefighters. BY THIS TIME, LEADERSHIP AT THE FIRE DEPARTMENT HAD MET WITHOUT MY KNOWLEDGE AND DECIDED TO HARASS ME INTO RETIRING BECAUSE OF MY AGE. [Assistant] Chief Durham told me the shift commanders and Chief Moulton had met and they all want me to retire. [Assistant] Chief Durham stated, he'd feel sorry for me if I didn't have retirement but since I do, I need to go ahead and retire. [Assistant] Chief Durham stated, Chief Moulton wants

you to retire. We want you to retire. Chief Moulton told me to go home and think about retiring.

August 7, 2018 – As directed by Chief Moulton, I met with [Assistant] Chief Cannady. [Assistant] Chief Cannady asked me about my long-term plan now that I'm back – am I going to stay or retire. [Assistant] Chief Cannady confirmed that he, Chief Moulton, [Assistant] Chief Renfroe, and [Assistant] Chief Durham had met, and the think I should retire.

August 8, 2018 – As directed by Chief Moulton, I met with [Assistant] Chief Renfroe. [Assistant] Chief Renfroe acknowledged there was a meeting between Chief Moulton, [Assistant] Chief Renfroe, [Assistant] Chief Cannady[,] and [Assistant] Chief Durham. While he said he couldn't tell me what to do, he referenced an article about a chief from another department who had an incident and retired.[15]

August 9, 2018 – I went to [Assistant] Chief Durham to discuss water collection. [ASSISTANT] CHIEF DURHAM INCREASED THE HARASSMENT. [Assistant] Chief Durham raised his voice and told me I ought to be ashamed. He elevated his voice and created a scene in front of subordinates. [Assistant] Chief Durham stated he wouldn't talk to me anywhere or anytime. . . . I walked away and returned to speak with him privately. [Assistant] Chief Durham yelled at me, he wants you gone, and that four of the top people think it would be best if I leave, and [Assistant] Chief Renfroe was trying to get through to me in a different angle from a different route.

August 10, 2018 – I met with Chief Moulton in his truck. He told me I know what he wants me to do. He told me he spoke with the mayor and the mayor wanted me to stop going to the stations to apologize to the firefighters for the incident. Chief Moulton acknowledged he had thought it was a good idea. Chief Moulton told me the mayor wanted to meet me on Monday (August 13). I reminded Chief Moulton I had a 12 p.m. appointment on Monday. Chief Moulton said he talked to [Assistant] Chief Durham regarding the incident where [Assistant] Chief Durham yelled at me on August 9. Chief Moulton told me he knows how a lot of people feel and how the people who work for me feel and they feel like I'm not doing what

---

[15] Notably, there also isn't anything in this portion of Plaintiff's grievance indicating that Assistant Chief Renfroe referred to the article "in an animated fashion." [Doc. 57-2, ¶ 87]; *see* n.12, *supra*.

everyone wants me to do. He told me he thinks the longer I stay, the worse it's going to be. Chief Moulton told me they would think more of me if I retired and that I would finally be taking responsibility for it. THE HARASSMENT IS CONSTANT AND OF THE NATURE WHICH MAKES MY EMPLOYMENT ALMOST UNBEARABLE. I CONTINUE TO DO MY JOB.

August 13, 2018 – Little contact with the department do to counting money for MDA, 12 p.m. appointment, and working at Station 2.

August 14, 2018 – MORE HARASSMENT IN VIOLATION OF STATE AND FEDERAL LAWS. I went to see [Assistant] Chief Renfroe and found Chief Moulton with him in his office. Chief Moulton asked me to join them. They began discussing how the fire department is going to move forward. [Assistant] Chief Renfroe asked Chief Moulton if I am staying or leaving and what he is supposed to tell his shift. I stated I am staying. Later, Chief Moulton and I went to his office. During that conversation I offered to stay in Warner Robins to avoid being a distraction in Dalton at the Fire Conference and just in case anything happens. Chief Moulton told me they don't want [Deputy] Chief Wood running the place.

[Doc. 49, pp. 603–04].

On August 23, 2018, Graham met with Chief Moulton and Assistant Chiefs Cannady, Renfroe, and Durham to discuss Plaintiff's grievance, and they all agreed that any mention of Plaintiff retiring or leaving the City Fire Department needed to stop. [Doc. 57-2, ¶ 119]. However, because Plaintiff had filed a formal grievance, more had to be done. In accordance with the formal grievance method outlined in the City's Employee Handbook, Plaintiff had to select one individual from a list of three mediators or investigators. [*Id.* at ¶ 112]; [Doc. 49, p. 780]. Plaintiff selected former City employee, Cathy Silengo. [Doc. 49, Wood Depo., p. 161:13–18]. Once selected, the formal grievance method required Silengo to "investigate the grievance[,] . . . interview

the aggrieved employee, the aggrieved employee's supervisor, . . . and all persons available that have knowledge of the events from which the grievance arose." [Doc. 57-2, ¶ 113]; [Doc. 49, p. 780]. Silgeno reviewed Plaintiff's grievance, and in a nutshell, she understood Plaintiff to allege that "he was being harassed to retire." [Doc. 47-13, Silengo Decl., ¶ 3].

Silengo interviewed Plaintiff and Chief Moulton on two separate days. [*Id.* at ¶¶ 3–4]. Silengo stated that during Plaintiff's interview, he informed her that Chief Moulton and Assistant Chiefs Cannady, Renfroe, and Durham "had been harassing him to retire based on his conduct that occurred while he was at a fire scene on July 5, 2018." [*Id.* at ¶ 3]. By the time Plaintiff and Silengo met, their comments about him leaving or retiring had stopped.[16] [*Id.*]. Although she doesn't really disclose how long she spoke with Plaintiff, she makes sure to note that "[a]t no point during [her] discussion with [Plaintiff] did he tell [her] that he believed he was asked to leave . . . or retire because of his age." [*Id.*]. In fact, Silengo stated in her declaration that Plaintiff never even mentioned age when they met but "recognized and understood that" the retirement

---

[16] While their comments about Plaintiff's leaving or retiring may have stopped, Plaintiff does make the caveat that there had only been one business day (Friday, August 24, 2018) between Thursday, August 23, 2018—when everyone agreed to stop the retirement commentary—and Monday, August 27, 2018—when Silengo interviewed Plaintiff. [Doc. 57-2, ¶¶ 119, 121]. Silengo says that she interviewed Plaintiff on August 23, 2018, but this is likely a scrivener's error. [Doc. 47-13, Silengo Decl., ¶ 3]; *see, e.g.*, [Doc. 47-13, p. 13 (Silengo's handwritten date)]. Plaintiff, on the other hand, testified that he met with Silengo regarding his grievance on August 27, 2018. [Doc. 49, Wood Depo., p. 162:5–12]. While it doesn't matter in the grand scheme of things when Plaintiff met with Silengo, it makes more sense that she met with him on August 27, 2018, since everyone hadn't agreed to stop the retirement commentary until August 23, 2018.

commentary "had to do with his actions" at the fire scene. [*Id.*]; *see also* [Doc. 47-13, p. 13 (Silengo's handwritten notes from her interview with Plaintiff)].

When it comes to Chief Moulton's interview, Silengo doesn't report all that much. Since Graham had already met with Chief Moulton and Assistant Chiefs Cannady, Renfroe, and Durham, and because they had already agreed that any comments about Plaintiff retiring or leaving needed to stop, Chief Moulton told Silengo that "all discussions" about Plaintiff leaving or retiring "had stopped." [Doc. 47-13, Silengo Decl. ¶ 4]; [Doc. 57-2, ¶¶ 119, 122].

Within seven days of Silengo's interview of Chief Moulton, she prepared her written report as required by the formal grievance method. [Doc. 47-13, Silengo Decl. ¶ 4]; [Doc. 47-13, p. 17 (written report dated "September 3, 2018")]; [Doc. 57-2, ¶¶ 114–15, 123]; [Doc. 49, p. 780]. Silengo wrote in her report that Plaintiff's "grievance is based on his feeling harassed to retire by Chief Moulton and [Assistant] Chiefs Durham, Cannady[,] and Renfroe following his recent disciplinary action." [Doc. 47-13, p. 17]. She also wrote that "[Plaintiff] advised he had no intention of retiring." [*Id.*]. Based on her investigation, it was Silengo's understanding that "no further mention had been made of his retiring[,]" and in her opinion, Plaintiff's grievance "ha[d] been satisfied." [*Id.*].

At this point, Mayor Toms had the right to review Silengo's report and "reject it for good cause." [Doc. 57-2, ¶ 115]; [Doc. 49, p. 781]. If Mayor Toms rejected her report,

Plaintiff's grievance would then proceed "to review by" Mayor Toms and City Council. [Doc. 49, p. 781]. "Otherwise, the report shall be disseminated to all parties in interest and the remedial plan implemented as soon as possible." [*Id.*]. However, Plaintiff never received a copy of Silengo's report. [Doc. 49, Wood Depo., pp. 164:3—165:25]. If he had, he testified that he would have appealed because he disagreed with it. [*Id.* at pp. 165:25—166:3]. "[F]rom reading her report[,]" Mayor Toms understood that discussions about Plaintiff leaving or retiring had ceased and that Plaintiff's grievance had been satisfied. [Doc. 57-2, ¶¶ 122, 124].

As to why Plaintiff never received a copy of Silengo's report, Mayor Toms never sent it to him. [Doc. 56-4, Toms Depo., p. 111:6]. Why? Because Mayor Toms testified that it was his "understanding that [Silengo's report] had been provided to [Plaintiff]" by Silengo herself. [Doc. 56-4, Toms Depo., pp. 110:21—111:4].

### **Plaintiff's Treatment After He Filed His Formal Grievance**

Luckily, "after [Plaintiff] filed the grievance . . . people quit asking him to retire." [Doc. 49, Wood Depo., pp. 192:21–25]; [Doc. 57-2, ¶ 126]. But, according to his deposition, his harassment continued in different ways. For example, Plaintiff testified that prior to his incident he "would always have been in the loop of an email concerning anything from [his] division." [Doc. 49, Wood Depo., p. 193:15–17]. On one such occasion, Chief Moulton wanted to know Plaintiff's opinion on something that must have been a topic in an email; however, because Plaintiff was "all of a sudden" not

being copied on certain emails, "all [he] could do [was] hold up [his] hands" and say, "I really don't know what you're talking about, Chief[.]" [*Id.* at pp. 193:23—194:2]. Plaintiff testified that given his rank, he should've been copied on these types of emails and that this perceived harassment was done to "make[] [him] look like a fool" who doesn't know what's going on in the City Fire Department. [*Id.* at p. 194:2—19]; [Doc. 57-2, ¶ 127].

A second example involves a concrete spill that caused a road closure on August 21, 2019. [*Id.* at p. 198:8—16]. Yes, 2019. By this time Plaintiff had already filed his lawsuit. [Doc. 1, p. 36]. In this other example of perceived harassment, Chief Moulton was out of town, and Mayor Toms called Assistant Chief Kenny Hamm, someone subordinate to Plaintiff, to take care of the concrete spill. [Doc. 49, Wood Depo., pp. 196:15—20, 198:6—7; 706—10]. But why was the mayor calling the City Fire Department about a concrete spill? To provide some context for that question, Plaintiff testified that he thought that "someone [who] owns a business" near the blocked road called the mayor "and probably bent his ear a little bit" to get the road unblocked and accessible. [*Id.* at pp. 201:6—8; 707—10]. No matter the reason, what Plaintiff perceived as improper conduct is easy enough to understand: Mayor Toms knew Chief Moulton was out of town, so, according to Plaintiff, Mayor Toms should've called him so that he—as the deputy chief—could delegate who addressed the concrete spill. [*Id.* at p. 196:17—20]. Instead, it was the other way around. Mayor Toms called Assistant Chief Hamm, an

administrative chief who is below Plaintiff in rank, and Assistant Chief Hamm called Plaintiff to inform *him* of the concrete spill. [*Id.* at pp. 196:17–20; 201:16].

Now that the Court has carefully reviewed the facts of this case and spilled a rather lengthy factual background in order to tell Plaintiff's story, let's get to his claims.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### 1.    42 U.S.C. § 1983

In briefing, Defendants state that Plaintiff's claims under Count One are "unclear." [Doc. 47-2, p. 7]. Defendants tell the Court that "it appears that Plaintiff contends that [they] deprived him of his equal protection and privacy rights under the Fourteenth Amendment in violation of [42 U.S.C § 1983]." [*Id.*]. Because Plaintiff's Response [Doc. 57-1] on the issue only confuses matters more, the Court thinks it's best to examine his Section 1983 claims from ground zero—that is, from what he alleges in his Third Amended Complaint. [Doc. 33-1, ¶¶ 64–71]. There, Plaintiff alleges that "[t]he Equal Protection Clause of the Fourteenth Amendment is essentially a direction that all persons similarly situated be treated alike." [*Id.* at ¶ 65]. Let's start with this.

### A.    The Equal Protection Clause of the Fourteenth Amendment

Without offering any response to Defendants' argument that age discrimination claims are not actionable under Section 1983, Plaintiff jumps straight into arguments centered around *Monell* liability since the governmental entity involved in this case is a city. [Doc. 57-1, p. 6]; [Doc. 33-1, ¶ 68]; *see also Monell v. Dep't of Soc. Servs. of City of New*

*York*, 436 U.S. 658 (1978). However, liability, for a municipality like the City of Warner Robins, will not attach "unless a municipal 'policy' or 'custom' is the moving force behind the constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 379 (1989). The requirement that there be some sort of policy in place is designed to "distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action *for which the municipality is actually responsible*." *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 n.5 (11th Cir. 2003) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986)). As the Court will explain, there is no constitutional violation presented under the facts of this case; thus, Plaintiff's focus on *Monell* liability is somewhat misplaced. Nevertheless, as to Defendants' first argument, the Court agrees that Plaintiff cannot assert an age discrimination claim under Section 1983. It is Defendants' underlying conduct that determines the remedy— not the right (equal protection) Plaintiff says they have violated. *Ring v. Crisp Cnty. Hosp. Auth.*, 652 F. Supp. 477, 482 (M.D. Ga. 1987).

Part of the ADEA's "elaborate statutory framework" is Congress's requirement that the Equal Employment Opportunity Commission "attempt to 'eliminate any alleged unlawful practice by methods of conciliation, conference, and persuasion[]'" after an employee properly files a charge of discrimination. *Id.* (quoting 29 U.S.C. § 626(d)(2)). Bringing an age discrimination claim under Section 1983 would thwart the EEOC's reconciliation efforts and allow plaintiffs to bypass Congress's statutory scheme

under the ADEA. *Ring*, 652 F. Supp. at 482 ("By establishing the ADEA's comprehensive scheme for the resolution of employee complaints of age discrimination, Congress clearly intended that all claims of age discrimination be limited to the rights and procedures authorized by the ADEA."). Thus, to the extent Plaintiff asserts an equal protection claim under Section 1983 based on his age, he cannot do so. "[T]he ADEA is the exclusive remedy for age discrimination, whether those claims are founded on the Constitution or on rights created by the ADEA."[17] *Id.*

## B.   Plaintiff's Substantive Due Process Claims

That said though, the ADEA doesn't preempt every Section 1983 claim that Plaintiff has asserted in this case. Section 1983 is a statutory vehicle for addressing the violation of a constitutionally protected right by a government actor. It is not, by itself, a source of substantive federal rights. *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). Instead, it provides "a method for vindicating federal rights elsewhere conferred" by the United States Constitution and federal statutes. *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). "A successful [S]ection 1983 action requires a showing that the conduct complained of (1) was committed by a person acting under color of state law and (2) deprived the complainant of rights, privileges, or immunities secured by the

---

[17] This is bolstered by the fact that Plaintiff's allegations regarding what he must ultimately prove for an equal protection claim of disparate treatment based on age fit squarely within the burden-shifting framework under *McDonell Douglas Corporation v. Green*, 411 U.S. 792 (1973); *see, e.g.*, [Doc. 33-1, ¶¶ 65–66]; *see also* [Doc. 69, pp. 2–3].

Constitution or laws of the United States." *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992).

The Due Process Clause of the Fourteenth Amendment of the United States Constitution guarantees citizens that no State shall deprive them of "life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. "The Supreme Court's interpretation of this clause explicates that the amendment provides two different kinds of constitutional protection: procedural due process and substantive due process." *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994) (citing *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)).

That said, the substantive portion of the Due Process Clause "protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty[.]'" *McKinney*, 20 F.3d at 1556 (internal citation omitted). Not all, but most of the rights "enumerated in the Bill of Rights are fundamental[,]" and outside of that, there are certain unenumerated rights, like the penumbral right of privacy for things like abortion, certain sexual rights in the home, and the right to marry that also merit constitutional protection. *Id.* (citing *Planned Parenthood v. Casey*, 505 U.S. 833 (1992)); *see also Lawrence v. Texas*, 539 U.S. 558 (2003); *Obergefell v. Hodges*, 576 U.S. 644 (2015).

The Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this uncharted area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S.

115, 125 (1992). Therefore, aside from the rights the Supreme Court has etched out, the substantive portion of the Due Process Clause doesn't provide the type of privacy right Plaintiff thinks it does. The Due Process Clause of the Fourteenth Amendment was intended to prevent governmental abuse of power or employment of that power as an instrument of oppression. *Harker Heights*, 503 U.S. at 126 (citation omitted) (alterations adopted). Thus, where substantive rights are created only by state law as is the case with tort law and some aspects of employment law, they are not subject to substantive due process protection. *McKinney*, 20 F.3d at 1556 (citation omitted). In 1976, the Supreme Court decided "with a firm statement" that government employment decisions are not covered by substantive due process jurisprudence:

> The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

*Id.* at 1559 (quoting *Bishop v. Wood*, 426 U.S. 341, 350 (1976)). Even though the Constitution doesn't provide for the substantive due process protection Plaintiff hopes for, the Due Process Clause still prohibits government conduct that "shocks the conscience." *Nix v. Franklin Cnty. Sch. Dist.*, 311 F.3d 1373, 1375 (11th Cir. 2002). "[O]nly

the most egregious official conduct" falls within this category. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998).

Undoubtedly, Plaintiff takes issue with the fact that Chief Moulton summoned Captain Edwards—who was, if you'll remember, an off-duty city police officer—to Plaintiff's house so that he could administer Alco-Sensor tests. [Doc. 47-9, Moulton Decl., ¶ 3]; [Doc. 47-12, Edwards Decl., ¶¶ 3–4]. Based on this, Plaintiff argues, quite broadly, that Defendants violated some general, unenumerated and apparently limitless "federal privacy right[]." [Doc. 57-1, p. 8]. Note that Plaintiff did not allege any violation of the most expressive and specific privacy right actually found in the text of the Constitution: "The right of people to be secure in their . . . houses[.]" U.S. Const. amend IV. His Section 1983 claim dances all around the Fourth Amendment, yet he never says a word about it. [Doc. 33-1, pp. 29–32]; [Doc. 47-2, p. 1].

Rather, the Plaintiff asks the Court to divine and declare a new, all-encompassing "fundamental" right to privacy in the United States Constitution. And, of course, the Court won't do that. The word "privacy" is conveniently omitted from the Constitution, yet the United States Supreme Court has recognized certain limited, fundamental rights (such as the right to abortion, marriage, contraception, and child-rearing) under the substantive portion of the Due Process Clause based on the penumbral right to privacy. *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997). However, the United States Supreme Court has never declared that the Constitution provides our citizens with a

general "fundamental" right to privacy as broadly as Plaintiff would have the Court enforce.

Accordingly, the Court finds that Plaintiff has failed to establish the violation of any recognized substantive due process right. And, without a constitutional violation, any claim against Chief Moulton and the City under Section 1983 must necessarily fail. So, since there is no fundamental right to privacy that applies to the specific facts of this case, and since Plaintiff specifically omitted any Fourth Amendment claim, his only viable Section 1983 route is to show that the governmental conduct at issue was egregious enough to shock the conscience. *Nix*, 311 F.3d at 1375. Conscience-shocking conduct, for example, can be conduct that was designed to injure someone "in a fashion that is not justified by any government interest." *Waldman v. Conway*, 871 F.3d 1283, 1292–93 (11th Cir. 2017) (citing *Tinker v. Beasley*, 429 F.3d 1324, 1328 (11th Cir. 2005) (per curiam)). What happened in this case simply doesn't fall within that category.

### 1. Plaintiff's Section 1983 Claim from the Alco-Sensor Tests

Chief Moulton called Captain Edwards and asked him "if [he] would be able to administer" an Alco-Sensor test "on an employee." [Doc. 47-12, Edwards Decl., ¶ 3]. Captain Edwards "told him [he] would." [*Id.*]. As a quick recap, after Plaintiff returned home from the fire scene, he grabbed a 24-ounce beer and took it upstairs to watch television. [Doc. 61, Plaintiff Decl., ¶ 21]. Around 10:00 p.m., Plaintiff's wife and daughter heard banging on the door, but when they realized it was Chief Moulton, they

let him in. [*Id.*]. Plaintiff was upstairs in bed, and Chief Moulton was simultaneously calling Plaintiff to tell him that he was at his house. [*Id.*]. Then, Plaintiff went downstairs and met with Chief Moulton while in his pajamas. [*Id.*].

At this point, Plaintiff was well within his rights to ask Chief Moulton to leave, but for some reason—be it his respect for Chief Moulton as a person, as his superior within the City Fire Department, or because he simply wanted to discuss Lt. Brantley and Assistant Chief Christian's accusations—he didn't. [Doc. 47-9, Moulton Decl., ¶ 3]. Considering these events and the City's Alcohol and Controlled Substance Policy, Plaintiff claims that he "did not waive his . . . right to privacy." [Doc. 33-1, ¶ 67]. But as explained above, there is no general constitutional privacy right to waive. So, any waiver argument is now moot. The only question left to be answered is whether Chief Moulton asking Plaintiff to submit to Alco-Sensor tests at Plaintiff's house shocks the conscience. Let's start with the City's policies regarding employees and alcohol consumption.

In order "to provide safe and effective public service[,]" the City "developed a comprehensive alcohol and controlled substance policy." [Doc. 56-5, p. 159]. The Alcohol and Controlled Substance Policy says that

> [t]he use of alcohol and controlled substances by the City of Warner Robins employees while on the job constitutes a direct threat to property and the safety of others. The work involved in many positions is inherently dangerous, and the safety of citizens and fellow employees depends upon the ability of employees to think clearly with unimpaired faculties.

[*Id.*]. These preamble-like provisions no doubt go to the objective for the City's alcohol policy, but what does it require of its employees? First, the City has a general policy in place that regulates alcohol use "for all employees of the City of Warner Robins." [Doc. 49, p. 734]. Not surprisingly, both the City's Employee Handbook and its alcohol policy state that "[r]eporting to work, or working, while intoxicated or otherwise impaired by alcohol or controlled substance use shall be prohibited." [*Id.*]; [Doc. 56-5, p. 159]. On top of that, one important provision of the City's alcohol policy is quite relevant for the facts of this case.

That provision says that "[i]ndividuals shall submit to alcohol and/or controlled substance abuse testing . . ."

> [i]f in the opinion of the Department Director or his/her designee, a reasonable suspicion (a reasonable suspicion must be based on objective indications of alcohol or controlled substance abuse; more obvious indications of alcohol and/or controlled substance abuse include repeated unauthorized absences, repeated illnesses, bloodshot eyes, slurred speech, lethargic behavior, behavior inappropriate or inconsistent with circumstances, or an employee[']s arrest for DUI, public drunkenness, or [v]iolation of the Georgia Controlled Substances Act) exists that the employee is reporting to work, or is working, while under the influence of alcohol or controlled substances, or while impaired from the use of same[.]

[Doc. 56-5, pp. 160, 170]. According to the City's alcohol policy, "[t]he test upon 'reasonable suspicion' involves a great deal of discretion on the part of the supervisory personnel." [*Id.* at p. 168]. However, who holds the role of "supervisory personnel" within the City Fire Department is tricky because of its firefighters' ever-changing duties. Of course, there is only one chief within the City Fire Department—Chief

Moulton, but he may not always be the person "in charge." The person "in charge" changes with each day's shift assignments. [Doc. 47-9, Moulton Decl., ¶ 2]; [Doc. 47-3, Brantley Decl., ¶ 3].

On the day of Plaintiff's incident, Lt. Brantley "was serving as Acting Assistant Chief for Shift 2." [Doc. 47-3, Brantley Decl., ¶ 3]. Serving in that capacity, Lt. Brantley "assumed command of the scene, was accountable for all personnel, and kept track of resources." [*Id.*]. As the "shift commander," Lt. Brantley held the "in charge" position and because he had full command of the fire scene and was accountable for *all* personnel, it's only logical that he fulfilled the relevant "supervisory personnel" role as Chief Moulton's designee. That's one way to look at it.

Remember how Lt. Brantley and Assistant Chief Christian thought Plaintiff had been drinking before he arrived on the fire scene? [Doc. 47-3, Brantley Decl., ¶ 3]; [Doc. 47-5, Christian Decl., ¶ 3]. If that was the case, then they never should have let him leave. When a supervisor suspects that an employee has come to work under the influence of alcohol or controlled substances, the City's alcohol policy lays out specific procedures on how to handle and address that situation.

First, "[a] supervisor shall determine if an employee 'appears' to be under the influence of alcohol, drugs, including controlled substances and prescriptions, or both." [Doc. 56-5, p. 170]. We have that here: Lt. Brantley informed Assistant Chief Christian about his suspicions, and Assistant Chief Christian took time to observe Plaintiff's

conduct. [Doc. 47-3, Brantley Decl., ¶ 3]; [Doc. 47-5, Christian Decl., ¶ 3]. Next,

> [t]he supervisor shall arrange[] for at least one other supervisor to observe the conduct of the employee. The observing supervisor shall make a written report of the observations[] which . . . shall include a description of the conduct of the employee upon which reasonable suspicion is based. In the case of an arrest, a copy of the police reports will be obtained.

[Doc. 56-5, p. 170]. We have those, too. Both Lt. Brantley and Assistant Chief Christian made written reports about Plaintiff's incident. *See, e.g.*, [Doc. 47-3, p. 5]; [Doc. 47-5, p. 5]; *see also* [Doc. 47-5, Christian Decl., ¶ 3]. Third, "[a] supervisor shall personally escort the employee to the supervisor's office." [Doc. 56-5, p. 170]. This, however, didn't happen even though elsewhere in the City's alcohol policy it says that "[u]nder no circumstances shall the employee suspected of being under the influence of alcohol . . . be permitted to leave the work site by himself." [*Id.* at p. 171].

Plaintiff says that he "checked out" with Lt. Brantley before he went to talk with Assistant Chief Christian, and then, subsequently checked out with him—to the extent Plaintiff saying, "[G]ood-bye. I'll see you later[]" can be considered as such under the City Fire Department's accountability system. [Doc. 49, Wood Depo., p. 49:5–13]; [Doc. 47-3, Brantley Decl., ¶ 4]. Plaintiff discusses this provision as a means to demonstrate that "if [Lt. Brantley and Assistant Chief Christian] did believe [he] was under the influence[,]" they "failed to do their job" by not following the City's alcohol policy. [Doc. 57-3, ¶ 9]. Defendants probably disagree with this assessment since Lt. Brantley stated that "[Plaintiff] never told [him] he was leaving the fire scene." [Doc. 47-3,

Brantley Decl., ¶ 4]. But that's not story the Court gets rely on. When you draw the justifiable inference in Plaintiff's favor, this could certainly be a case where Lt. Brantley and Assistant Chief Christian technically may have failed to follow the procedures outlined the City's alcohol policy.[18] *Anderson*, 477 U.S. at 255. However, focusing on Lt. Brantley and Assistant Chief Christian's actions (or potential lack thereof) distracts from the real focus of Plaintiff's substantive due process claim. This, of course, brings us back the Alco-Sensor tests, and provides another way to look at why the events surrounding Plaintiff's incident may have unfolded the way they did.

In other words, if Lt. Brantley, as Acting Assistant Chief at the fire scene, could never be the "supervisory personnel" contemplated by the City's alcohol policy, then Chief Moulton—as Plaintiff's direct supervisor—has to come into the mix somehow. [Doc. 57-2, ¶ 5]. The most obvious reason: He's the chief, and he needed to know what was going on with every aspect of the fire scene.

We have to remember that we are dealing with a fire department here. Thus, considering what it does and how its work is carried out, its personnel may not always be a position to strictly adhere to the procedures outlined in the City's alcohol policy. For example, Plaintiff and all those involved were at a fire scene. So, it simply wasn't

---

[18] The Court pauses to note that its discussion should in no way be interpreted as saying that Lt. Brantley and Assistant Chief Christian *actually* failed to follow the City's alcohol policy. Rather, the Court is only saying that application of the legal standard for summary judgment lends to a possibility that they might have.

feasible for Lt. Brantley to "personally escort [Plaintiff] to [an] office." [Doc. 56-5, p. 170]. Lt. Brantley did, after all, have a fire scene to monitor and people to account for. Maybe if Lt. Brantley would've made Plaintiff stay at the fire scene based on his reasonable suspicion as the "supervisory personnel," the procedures outlined in the City's alcohol policy could've been more closely followed. [Doc. 56-5, p. 168]. But that's not what happened that night. Drawing the justifiable inference in Plaintiff's favor, they let him leave the fire scene even though they thought he had been drinking before he arrived to it.

Nevertheless, Chief Moulton had been informed of everything. Not only had Lt. Brantley and Assistant Chief Christian been in communication with Chief Moulton, but Plaintiff himself made sure Chief Moulton was "aware of the question . . . about whether [he] had been drinking before he arrived on the [fire] scene." [Doc. 47-3, Brantley Decl., ¶ 5]; [Doc. 47-5, Christian Decl., ¶ 4]; [Doc. 49 Wood Depo., p. 50:7–16]. So, if we want Chief Moulton to be the individual using the "reasonable suspicion" test pursuant to the City's alcohol policy, whatever Lt. Brantley and Assistant Chief Christian did or didn't do has to fall to the wayside.

Chief Moulton took matters into his own hands for the simple fact that he's the chief. [Doc. 57-2, ¶ 5]. With everything that Chief Moulton had been told, to argue that he didn't have "reasonable suspicion" would be completely unreasonable. [Doc. 56-5, p. 168]. This bring us to the next inquiry: What did the City's alcohol policy require of

Chief Moulton at that point?

"After it has been determined that a 'reasonable suspicion' exists, the next step is to actually test the employee for the presence of alcohol." [Doc. 56-5, p. 168]. The City's alcohol policy says that "[t]he employee will be *called into a private office*, informed of the allegations of Policy violation, and be requested *to sign* the 'Employee Consent and Notice' form." [*Id.* (emphasis added)]. "When testing for alcohol, the standard Breathalyzer used for DUI suspects is sufficient. The City policy is that[] any alcohol content (BAC) level indicates policy violation." [*Id.* at p. 166]. If an employee "refuses to consent, [he] may be disciplined. The employee may be terminated for insubordination pursuant to the procedure outlined in the City Code and the Alcohol and Controlled Substance Policy." [*Id.* at p. 169]. "If the employee consents to the screening test, and the confirmed results indicate the presence of alcohol . . . in the employee's system, the employee will be assumed to be in violation of" the City's alcohol policy "and will be disciplined in accordance with th[e] Policy and the City Code." [*Id.*]. "If it is determined that a violation of the Policy has occurred (the reasonable suspicion has been backed up by a positive confirmed screening test plus any corroborating evidence of a violation), the employee may be terminated or referred to the EAP." [*Id.*].

As late in the evening as it was, Chief Moulton decided it was easier (and safer no doubt) to just go to Plaintiff's house to investigate. Should Chief Moulton have acted in strict accordance with the relevant policy provisions by "call[ing] [Plaintiff] into a

private office" to inform him of the allegations against him? [*Id.* at p. 168]. Maybe. Maybe not. Again, we're dealing with alcohol here and waiting until the next morning to address Chief Moulton's reasonable suspicion may have been too late. That said though, sheerly based on *what* Chief Moulton's reasonable suspicion *was*, what a ludicrous argument it would be to say that Chief Moulton should have made Plaintiff get back out on the road and drive to the City Fire Department so that the two of them could have been in "a private office." [*Id.*]. Moreover, whether Plaintiff didn't refuse to take the Alco-Sensor tests or whether he should've demanded that Chief Moulton wait until Plaintiff could sign the relevant paperwork seem to be moot points since the City's alcohol policy says that Plaintiff could be disciplined or terminated for insubordination if he refused it. [Doc. 49, Wood Depo., p. 59:18]; [Doc. 56-5, p. 169]. Bottom line, whether it be because he didn't refuse it or felt he couldn't, Plaintiff took the Alco-Sensor tests "out in front of [his] house." [Doc. 49, Wood Depo., p. 60:8–12]. Graham, the City's Human Resources Director, testified that the testing should never have happened like it did. Plaintiff chocks this up to the City's failure to implement safeguards to protect his privacy rights and its failure to adequately train Chief Moulton on how to handle situations like Plaintiff's incident. *See* [Doc. 56-5, Graham Depo., p. 54:5–6]; [Doc. 33-1, ¶¶ 69–70].

To Plaintiff's credit, the City's alcohol policy may have its gaps when it comes to the specialties of the City Fire Department and the non-traditional office settings its

firefighters often encounter. At this point though, it has to be beyond dispute that the events surrounding Plaintiff's incident are nothing short of unique. Just because the City's alcohol policy may not be tailored to specifically address a situation like Plaintiff's, doesn't automatically mean that Chief Moulton's actions were egregious enough to "shock[] the conscience." *Nix*, 311 F.3d at 1375.

Where he could, Chief Moulton complied with the City's alcohol policy. It's evident that Chief Moulton didn't adhere "to the letter" of the City's alcohol policy and that it wasn't designed to deal with the unique facts of this particular incident. True, the City's alcohol policy may be less than perfect when it comes to detailing how a supervisor should test a city employee for an alleged alcohol violation late at night and removed from the traditional office setting. No one, though, can reasonably argue that any imperfection prevented a supervisor like Chief Moulton from exercising some discretion on how to handle such a scenario quickly, effectively, and safely.

Given not only the structure of the City Fire Department but the quickness by which Chief Moulton needed to act to confirm his reasonable suspicion—that Plaintiff might have been drinking before reporting to a structure fire in progress—his going to Plaintiff's house to investigate is simply not so egregious as to shock the conscience. *Nix*, 311 F.3d at 1375; *Cnty. of Sacramento*, 523 U.S. at 836.

To succinctly reiterate, Plaintiff has failed to identify any recognized substantive due process right applicable to his particular factual scenario, keeping in mind that a

general, overarching federal privacy right doesn't exist under our federal Constitution. Moreover, the conduct surrounding the Alco-Sensor testing doesn't shock the conscience. Therefore, since Plaintiff has failed to establish the violation of an established constitutional right, any Section 1983 claim necessarily fails.

Accordingly, the Court **GRANTS** summary judgment to the City and Chief Moulton with respect to this part of Plaintiff's Section 1983 claim set forth in Count One.

> **2.** Plaintiff's Section 1983 Claim Regarding His Employee Discipline and Participation in the City's EAP

The same analysis largely applies to Plaintiff's second substantive due process claim regarding the City's "fail[ure] to adequately supervise and train . . . personnel" with respect to his employee discipline and medical records. [Doc. 33-1, ¶¶ 67, 70]. Recall that Mayor Toms allegedly confirmed to Reid that Plaintiff was participating in the City's EAP and that the City released his disciplinary records in response to various media outlets' request under Georgia's Open Records Act. Plaintiff alleges that these acts also violated his "federal privacy rights." [*Id.* at ¶¶ 97–102].

Plaintiff argues that the disclosure of his private health information without his consent violated HIPAA, 42 U.S.C. § 1320d-6. [Doc. 57-1, p. 19]. But HIPAA itself doesn't provide a private right of action for any supposed violation of its confidentiality provisions. *Bradley v. Pfizer, Inc.*, 440 F. App'x 805, 809–10 (11th Cir. 2011) (citing *Acara v. Banks*, 470 F.3d 569, 571–72 (5th Cir. 2006)); *see also Crawford v. City of Tampa*, 397 F. App'x 621, 623 (11th Cir. 2010). Moreover, Plaintiff cannot prevail on a Section 1983

claim when the supposed "HIPAA violator" is a government actor. *Sneed v. Pan Am. Hosp.*, 370 F. App'x 47, 50 (11th Cir. 2010) (citing *Acara*, 470 F.3d at 571–72) ("We decline to hold that HIPAA creates a private cause of action . . . or rights that are enforceable through [Section] 1983.").

To reiterate the Court's discussion from above regarding the substantive portion of the Due Process Clause, its protections just aren't as broad as Plaintiff contends. The disclosure of what Plaintiff considers to be private matters simply doesn't ring a constitutional bell. These harms, if any, can "be corrected in other ways." *McKinney*, 20 F.3d at 1559. Accordingly, the Court **GRANTS** summary judgment to the Defendants on the remaining portion of Plaintiff's substantive due process claim asserted in Count One.

## 2. **ADEA Claims**

Counts Two through Four relate to Plaintiff's ADEA claims against the City. The ADEA provides that "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age" if that individual is at least 40 years old. 29 U.S.C. §§ 623(a)(1), 631(a).

The burden-shifting framework from *McDonell Douglas Corporation v. Green*, 411 U.S. 792 (1973), applies to age discrimination claims that rely on circumstantial evidence. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013). "Under this

framework, a plaintiff must first establish a prima facie case of discrimination." *Id.* "Next, the defendant must articulate a legitimate, non-discriminatory reason for the challenged employment action." *Id.* "If the defendant articulates one or more such reasons, the plaintiff is afforded an opportunity to show that the employer's stated reason is pretext for discrimination." *Id.* "The burden of persuasion always remains on the plaintiff in an ADEA case to proffer evidence sufficient to permit a reasonable fact finder to conclude that the discriminatory animus was the 'but-for' cause of the adverse employment action." *Id.* (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–78 (2009)).

### A.     Age Discrimination

Plaintiff alleges that he was discriminated against because of his age. [Doc. 33-1, ¶¶ 72–74]. Of course, we know that Plaintiff wasn't terminated from his position within the City Fire Department. Instead, he alleges that he received a harsher discipline than younger individuals for similar conduct and that the age bias from certain individuals mentioned above was nothing other than an "attempt to force Plaintiff to retire from his job because of his age." [*Id.* at ¶¶ 72, 74].

Plaintiff alleges that "[t]here is direct and indirect evidence of age discrimination" in this case. [*Id.* at ¶ 72]. However, his arguments in opposing Defendants' summary judgment motion—other than telling the Court how a plaintiff can prove a case of discrimination and what constitutes direct evidence—never discuss this supposed direct evidence. *See* [Doc. 57-1, pp. 12–14]. Thus, the Court assumes that

Plaintiff relies on the indirect or circumstantial evidence route developed in *McDonell Douglas* which begins with a prima facie case. *Sims*, 704 F.3d at 1332.

To establish a prima face case of age discrimination, Plaintiff must show that: (1) he was 40 years of age at the time of the violation of the ADEA; (2) he was qualified for the position held; (3) he was "otherwise discriminate[d] against . . . with respect to his compensation, terms, conditions, or privileges of employment"; and (4) someone similarly situated and "substantially younger" than him was treated differently with respect to their "compensation, terms, conditions, or privileges of employment." *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012); 29 U.S.C. § 623(a)(1). In short, Plaintiff must point to a similarly situated, substantially younger employee who was treated differently—in court-speak, he must point to a "comparator." *Lewis v. City of Union City ("Lewis I")*, 918 F.3d 1213, 1217 (11th Cir. 2019) (en banc).

Under *Lewis I*, a plaintiff asserting an intentional discrimination claim under *McDonnell Douglas* must demonstrate that he and his proffered comparators are similarly situated in all material respects. *Id.* at 1218. The "all material respects" standard isn't so demanding that it cuts the comparator rope just because a plaintiff and his comparators hold different job titles. *Id.* at 1227 (citing *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) ("The relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment practices.")). Rather, a similarly situated comparator

- will have engaged in the same basic conduct or misconduct, as the case may be;

- will have been subject to the same employment policy, guideline, or rule as a plaintiff;

- will ordinarily have been under the same supervisor as a plaintiff; and

- will share a plaintiff's employment or disciplinary history.

*Lewis I*, 918 F.3d at 1227–28. In short, if a plaintiff and his proffered comparators "cannot be reasonably distinguished[,]" you have a proper comparator for a discrimination claim.[19] *Id.* (quoting *Young v. United Parcel Serv.*, 135 S. Ct. 1338, 1355 (2015)).

Plaintiff (born in 1963) identifies three other firefighters to establish his prima facie case. [Doc. 47-2, p. 15]; [Doc. 57-2, ¶ 4]. For some reason though, Plaintiff makes arguments that distinguishes these three firefighters from himself as opposed to arguing why they are similar. *See, e.g.*, [Doc. 57-2, ¶¶ 52–55].

First up is Curtis Haslem (born in 1969). [Doc. 57-2, ¶ 52]. Haslem is an assistant fire chief who was placed on a five-day suspension (compared to Plaintiff's 10-day suspicion), required to participate in EAP, and undergo random drug testing for a year by another fire chief (not Chief Moulton) for arriving onto a fire scene after drinking alcohol. Plaintiff argues that Haslem is "not the same comparison" since Plaintiff's BAC

---

[19] While a difference in job titles isn't the main focus for a comparator analysis, the Court must stress the fact that Plaintiff, unlike his proffered comparators, is the deputy chief. He's the second in command at the City Fire Department (and there is only one), and the responsibilities placed on him when compared to the many other firefighters with inferior ranks may be sufficient under the "all material respects" standard to prevent Plaintiff from having a viable comparator. *See* n.22, *infra*.

was zero when he arrived onto the fire scene. [Doc. 57-2, ¶ 52]. Not only does Plaintiff's argument work to show a difference between himself and Haslem, but to the extent it relies on Plaintiff's internet-based BAC calculator, the Court gives it no deference. *See* n.6, *supra*.

Sure, Haslem's misconduct may have been the same as Plaintiff's, but he can't be properly considered a comparator for the simple fact that his supervisor wasn't Chief Moulton. *Lewis I*, 918 F.3d at 1227–28 (citing *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (observing that "disciplinary measures undertaken by different supervisors may not be comparable for purposes of [a comparator] analysis")). Moreover, they didn't hold the same position: Plaintiff is the deputy chief—the only one, and Haslem is one of several assistant chiefs. While both may be high-ranking and even senior leaders, they aren't the same in all material respects, and that is fatal.

Plaintiff's second attempt to locate a proper comparator is Jake Gilbert (born in 1997), a rookie firefighter who Chief Moulton placed on a three-shift unpaid suspension and ordered to EAP participation for boating under the influence while off-duty. [Doc. 57-2, ¶ 53]. As for why Gilbert isn't a proper comparator, Plaintiff once again argues that *his* BAC was zero when he arrived onto the fire scene. [*Id.*]. Additionally, Plaintiff argues that even though Gilbert was arrested for boating under the influence, he received a less harsh punishment than Plaintiff did. [*Id.*].

Even though Gilbert's arrest for boating under the influence while off-duty may

seem worse than Plaintiff's incident—and thus deserving of the same or harsher punishment—it's simply different. An arrest for boating under the influence can't be used as a comparison for Plaintiff's incident. Plaintiff would have the Court accept Gilbert as a valid comparator because he received "better treatment" even though he was involved in what might reasonably be perceived as a more serious offense. *See* [Doc. 57-2, ¶ 53]. This argument is misplaced. It "overlooks the fact that the question for purposes of the *McDonnell Douglas* analysis is whether [Gilbert's] alleged misconduct was sufficiently similar to [Plaintiff's] so that the different disciplinary actions they received would give rise to an inference of discrimination." *Blash v. City of Hawkinsville*, 856 F. App'x 259, 265 (11th Cir. 2021). While a firefighter driving a boat (off-duty) and intoxicated compared with a deputy chief reporting to a fire scene (obviously on duty) after drinking are both dangerous, they are certainly different. Plaintiff's argument that Gilbert's conduct was worse than his merely highlights the fact that their conduct was different—and "[t]reating *different* cases differently is not discriminatory, let alone intentionally so." *Id.* (quoting *Lewis I*, at 1222–23).

And third, is Robbie Campbell (born in 1968), a long-tenured firefighter, who Chief Moulton placed on a ten-day suspension and required EAP participation as well as random drug testing for a year after he tested positive for alcohol during a random drug and alcohol screening. [Doc. 57-2, ¶ 55]. At first glance, all signs preliminarily point to Campbell as a valid comparator despite the fact that both he and Plaintiff are

over 40. Defendants argue that Campbell's age prevents him from being a valid comparator since he and Plaintiff are "both within the same protected class." [Doc. 47-2, p. 15]. However, membership in the "over 40" threshold isn't the relevant inquiry. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996). "The proper inquiry under *McDonnell Douglas* is whether [Campbell] was substantially younger than [Plaintiff]." *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1299 (11th Cir. 2015) (citation omitted). Eleventh Circuit caselaw says that a difference of only three years is enough to show that someone is substantially younger even though that someone is also a member of the plaintiff's protected class. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999) (five years is enough); *Carter v. DecisionOne Corp.*, 122 F.3d 997, 1003 (11th Cir. 1997) (per curiam) (three years is enough). Plaintiff was born in 1963, and Campbell was born in 1968—five years apart. [Doc. 57-2, ¶¶ 4, 55]. So, here, age is but a number. On top of that, Chief Moulton supervised both men at the relevant times. [*Id.* at ¶ 55]. Based on these things, Campbell would seem to fit the comparator label were it not for the fact that Campbell's alcohol-based infraction is markedly different than Plaintiff's.

Campbell tested positive for alcohol at a random drug and alcohol screening while he was on-duty. [*Id.*]; [Doc. 49, Wood Depo., pp. 118:24—119:1]. Plaintiff, on the other hand, responded to a structure fire alert and drove to that structure fire in a government vehicle. [Doc. 49, Wood Depo., p. 42:4–23]. Thankfully, "[e]verything was

fine" at the fire scene and "[e]veryone was evacuated[,]" but Plaintiff still saw the need to "put on [his] work boots" and his "bunker gear[,]" and ask Lt. Brantley for an update on "what was going on" with the fire. [*Id.* at pp. 43:21—44:7]. An update that could have easily placed Plaintiff in action.

Clearly, both Campbell and Plaintiff were "on the job," but Plaintiff's intentional actions were far more precarious than Campbell's positive alcohol test. Anti-discrimination laws prohibit employers from treating like cases differently, but with Campbell and Plaintiff, we have two very different cases. *Lewis I*, 918 F.3d at 1222 (quoting *N.L.R.B. v. Collier*, 553 F.2d 425, 428 (5th Cir. 1977)). Campbell, the lower-ranked firefighter, tested positive for alcohol and wasn't responding to a structure fire alert. [Doc. 49, Wood Depo., p. 118:16–19]. Plaintiff, *the deputy chief*, responded to a structure fire having drank a 24-ounce beer beforehand. Of course, Plaintiff would argue that because he consumed that beer "an hour and a half" or "three hours" before he went to the fire scene, his BAC would've been at zero percent.[20] [Doc. 49, Wood

_____

[20] Even though Plaintiff doesn't dispute that the two Alco-Sensor tests showed a result of .12, he says that his BAC was zero percent while at the fire scene. [Doc. 57-2, ¶ 43]; [Doc. 49, Wood Depo., pp. 61:15—62:1]. Remember though, Plaintiff banks that argument on completely inadmissible expert testimony. *See* n.6, *supra*. Nevertheless, whether Plaintiff's Alco-Sensor tests produced a positive result of .12 because of the single 24-ounce beer he consumed around 9:10 p.m. (after he returned home from the fire scene) or whether he was acting out of character because of the 24-ounce beer he drank around 5:30 and 6:00 p.m. (before going to the fire scene) are irrelevant concerns. *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (citing *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)); [Doc. 47-5, Christian Decl., ¶ 3]; [Doc. 49, Wood Depo., pp. 41:20–21; 52:1–9; 74:23–24]. Chief Moulton saw fit to discipline Plaintiff for a non-discriminatory reason—a reason unmotivated by Plaintiff's age, and that type of discipline is permissible under the law. That said, however, while these concerns may be irrelevant under *Alvarez* for evaluating Plaintiff's federal discrimination claims, they may prove to be highly relevant for some of Plaintiff's state law claims.

Depo., pp. 75:24—76:2]; [Doc. 61, Wood Decl., ¶ 18]. But this doesn't remove the fact that Chief Moulton disciplined Plaintiff for "drinking alcohol before arriving onto [the] fire scene and [for] initially lying about it." [Doc. 47-9, Moulton Decl., ¶ 6]. As far as Plaintiff's discrimination claim is concerned, Eleventh Circuit case law permits Chief Moulton to discipline Plaintiff "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (citing *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)); *see also* n.23, *infra*. Again, the only thing Chief Moulton can't do is discipline Plaintiff "for a discriminatory reason." *Alvarez*, 610 F.3d at 1265.

Looking at the big picture, Plaintiff proffers Campbell as a comparator because they both produced positive alcohol tests—allegedly. [Doc. 49, Wood Depo., pp. 118:6—119:1]; *see* n.20, *supra*. If the 24-ounce beer Plaintiff admits he consumed (at the earliest) three hours before he responded to the structure fire alert could be placed on the same footing as Campbell's positive alcohol test, one glaring distinction remains: Plaintiff *voluntarily went to that fire scene*, and Campbell's test was randomly conducted at the City Fire Department. [Doc. 49, Wood Depo., pp. 41:16—43:12]; [Doc. 64-1, p. 11 (noting that Campbell "remained at the station" after his positive alcohol result)]. Campbell wasn't at a fire, and he most certainly wasn't actively engaging with other firefighters who were working to ensure and maintain safety for everyone involved at a fire scene. The two men simply didn't engage in the same basic misconduct and that distinction is

enough to pull Campbell from underneath the "similarly situated in all material respects" label. *Lewis I*, 918 F.3d at 1226–27.

Even if Campbell could somehow be considered a proper comparator based on an argument that Campbell could have just as easily be placed into action because of a fire emergency, Plaintiff nevertheless admits that their discipline was the same. [Doc. 57-2, ¶ 55]; *see also* [Doc. 64-1, p. 11]. Thus, Plaintiff wasn't treated less favorably, and less favorable treatment is critical to any intentional discrimination claim. Where a plaintiff can't show that he received less favorable treatment there is no discrimination.[21] *See Lewis I*, 918 F.3d at 1224; *see also Lathem*, 172 F.3d at 793 ("The relevant inquiry is . . . whether the employer subjected them to different employment practices.").

The Court takes a moment to note that it would conclude that Plaintiff failed to establish a comparator for another, much simpler reason. All of these alcohol-based incidents are completely immaterial when it comes to *who* Plaintiff needed to proffer as his comparator. Looking at why *Plaintiff* says he was disciplined, as the Court must, the parties missed the mark by focusing on firefighters who had been disciplined for alcohol infractions. Why? Because throughout this case, Plaintiff has consistently and repeatedly argued that he "believes he was disciplined for *not telling the truth* when

---

[21] Assuming, without deciding, that Campbell is similarly situated to Plaintiff in all material respects, Defendants have articulated—and Plaintiff even agreed with it—a legitimate, non-discriminatory reason for Plaintiff's discipline. *Sims*, 704 F.3d at 1332.

Chief Moulton initially asked whether he had a drink." [Doc. 57-2, ¶ 43 (emphasis added)]. In fact, Plaintiff vehemently disputes that he was "disciplined for drinking alcohol before arriving at the fire scene[.]" [*Id.*]. All of the arguing from both sides about a prima facie case that focuses on potential comparators involving alcohol rather than potential comparators accused of lying or being untruthful as Plaintiff contends, strips the Court of any means to conduct a meaningful comparator analysis.[22]

As you can tell, there are a lot moving parts to this case, but one thing sticks out above the rest—a complete lack of discrimination *because of* Plaintiff's age. Chief Moulton stated that he "made the decision to discipline [Plaintiff] because he drank alcohol before arriving onto a fire scene[] and because he did not initially tell [him] the truth when [he] asked [Plaintiff] if he had been drinking alcohol before he arrive onto

---

[22] "[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive summary judgment in an employment discrimination case." *Lewis v. City of Union City ("Lewis II")*, 934 F.3d 1169, 1185 (11th Cir. 2019). 'Even without similarly situated comparators, 'the plaintiff will always survive summary judgment if he . . . presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Id.* "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, (1) suspicious timing, ambiguous statements or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting *Lewis II*, 934 F.3d at 1185). Without question, Plaintiff had the opportunity to argue that the convincing mosaic theory might apply to his age discrimination claim. He just, however, chose not to construct such an argument. Since Plaintiff did not "squarely present[] a 'convincing mosaic' argument to support his disparate-treatment theory in his [summary judgment] briefing" to the Court, the Court will not construct it on his behalf. *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1273 (11th Cir. 2021). It is not the Court's obligation to "cull through an entire record to search for evidence that creates a disputed issue of fact." *See United States v. Adkinson*, 135 F.3d 1363, 1378–1380 (11th Cir. 1998); *Johnson v. City of Ft. Lauderdale*, 126 F.3d 1372, 1373 (11th Cir. 1997); *see also Dickson v. Amoco Performance Prod., Inc.*, 845 F. Supp. 1565, 1570 (N.D. Ga. 1994) ("It should be the party's responsibility to direct the [C]ourt's attention separately to each portion of the record which supports each of the party's distinct arguments.").

the fire scene."[23] [Doc. 47-9, Moulton Decl., ¶ 6]. What's missing from that? Chief

Moulton disciplining Plaintiff "because of his age." 29 U.S.C. §§ 623(a)(1); *O'Connor*, 517

U.S. at 312. Not only was Chief Moulton's discipline devoid of any age-based reason,

Plaintiff himself doesn't really believe that age played a factor in his discipline.

> Q:      Do you contend you were suspended because of your age?
>
> A:      No.
>
> Q:      Do you contend you received any discipline because of your age?
>
> A:      No, ma'am.
>
> Q:      Did you tell anyone that you were disciplined because of your age?
>
> A:      No, ma'am.
>
> Q:      Did you ever see anything in writing indicating that you were disciplined because of your age?
>
> A:      No, ma'am.

[Doc. 49, Wood Depo., p. 233:18–23]. What's missing? Any evidence that Plaintiff's

discipline was "because of" his age.

    This mountain of evidence clearly and unequivocally shows that there is nothing

in this case from which a reasonable jury could find that Plaintiff's age was the but-for

---

[23] Clearly, Plaintiff disputes any assertion that however much he had to drink somehow thrusts him into some category of "drunkenness" that warranted concern from Chief Moulton or anyone else for that matter. However, whether Plaintiff's 24-ounce beer hours before the fire got him to that level is largely irrelevant (at least as far as his discrimination claim is concerned) because an employer may discipline an employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Alvarez*, 610 F.3d at 1265 (citing *WLCY Radio*, 738 F.2d at 1187); *see also* n.20, *supra*.

cause of his discipline. *Gross*, 557 U.S. at 179. Accordingly, the Court **GRANTS**

summary judgment to Defendants with respect to Plaintiff age discrimination claim

under the ADEA asserted in Count Two of his Third Amended Complaint.

### B.      Retaliation

Count Three of Plaintiff's Third Amended Complaint is a retaliation claim. [Doc.

33-1, ¶¶ 75–82]. While unclear, Plaintiff appears to allege that he was retaliated against

after he submitted his formal grievance, and many of his allegations for this claim could

center around what he describes as an "all-out effort to get him to resign" and a "lynch

mob to force [him] to retire." [*Id.* at ¶ 78]; [Doc. 57-1, p. 16]. In addition to not being

copied on certain emails, Plaintiff claims that Mayor Toms' failure to send Plaintiff a

copy of Silengo's report was an act of retaliation. [Doc. 33-1, ¶¶ 76, 79]; [Doc. 57-2, ¶¶

127, 141]. In addition to these alleged retaliatory acts, Plaintiff could also point to the

events surrounding the concrete spill. [Doc. 57-2, ¶ 128]. Again, it's not entirely clear,

but Plaintiff could arguably take the position that Mayor Toms' failure to "follow the

chain of command" is a further act of retaliation against him. [*Id.*]; [Doc. 49, Wood

Depo., p. 196:11–20].

But none of this really matters because the Court doesn't have to decide the

merits of Plaintiff's retaliation claim. This claim ends here because Plaintiff abandoned

it when he didn't respond to Defendants' arguments that he failed to administratively

exhaust it even after he filed a perfected charge of unlawful employment conduct with

the EEOC. [Doc. 47-2, pp. 23–27]; [Doc. 57-2, ¶ 139 (undisputed by Plaintiff that his

perfected charge does not allege that he was retaliated against for engaging in protected

activity)]; *see Moore v. Camden Prop. Tr.*, No. 1:17-CV-01655-ELR, 2019 WL 11441431, at

*3 (N.D. Ga. Mar. 26, 2019) (collecting cases for the proposition that "when an argument

is raised that a claim is subject to dismissal, and the [nonmoving] party fails to respond

to such an argument, such claims are deemed abandoned"), *aff'd*, 816 F. App'x 324 (11th

Cir. 2020). Not only did Plaintiff not respond to Defendants' substantive arguments that

he failed to administratively exhaust his retaliation claim, but he also gave no response

to Defendants' arguments that he cannot establish a prima facie face of retaliation on

the basis that "he has not suffered a materially adverse employment action." [Doc. 47-2,

p. 25 (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 68 (2006))]; *see also Gogel v. Kia

Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134–35 (11th Cir. 2020) (en banc) (discussing

retaliation in Title VII context). Plaintiff's brief opposing Defendants' summary

judgment motion only mentions the word "retaliation" twice: when introducing the

general averments of his case and when discussing the facts of a case he uses to support

his state law claim of intentional infliction of emotional distress. *See, e.g.*, [Doc. 57-1, pp.

2, 18]. Otherwise, Plaintiff's brief is completely silent when it comes to retaliation; thus,

he has abandoned that claim. *See* [Doc. 57-2, ¶ 141].

Accordingly, the Court **GRANTS** summary judgment to Defendants with

respect to Plaintiff's retaliation claim asserted in Count Three of his Third Amended

Complaint.

## C.     Hostile Work Environment

Assuming Plaintiff can even sue for a hostile work environment based on age, he

has to show that he belongs to a protected group, that he was subject to unwelcome

harassment that was based on his protected characteristic, that the harassment was

sufficiently severe or pervasive to alter the terms of his employment, and that

Defendants knew or should have known of the harassing conduct but failed to take

prompt, remedial action.[24] *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th

Cir. 2002).

Here, Plaintiff's age obviously places him in a protected group, and, as Plaintiff

puts it, he was subject to unwelcome, "age-based comments hidden under the guise of

'[O]h boy[,] do you need to retire now[] based on making the [City] Fire Department

look good [*sic*] after what you did[.]'" [Doc. 57-1, p. 15]. Next, a viable hostile work

environment claim will have allegedly harassing behavior that is sufficiently severe or

pervasive to alter the terms of employment. *Miller*, 277 F.3d at 1275; *Harris v. Forklift*

*Sys., Inc.*, 510 U.S. 17, 23 (1993) (whether an environment is 'hostile' or 'abusive' can be

determined only by looking at all the circumstances[]"); *Mendoza v. Borden, Inc.*, 195 F.3d

---

[24] The Court says "[a]ssuming" because the Eleventh Circuit has never decided "whether the hostile environment doctrine developed in Title VII actions applies in an ADEA action." *EEOC v. Massey Yardly Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1249 n.7 (11th Cir. 1997). In *Massey*, the Eleventh Circuit did, however, note that only one circuit court of appeals, the Sixth Circuit, has found it to be "a relatively uncontroversial proposition" that the hostile environment theory is viable under the ADEA. *Id.* (quoting *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996)).

1238, 1246 (11th Cir. 1999) ("[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"). In other words, an actionable hostile work environment claim involves behavior "that a reasonable person would find hostile or abusive" and an environment that the employee subjectively perceived as abusive. *Miller*, 277 F.3d at 1276. The "reasonable person," or objective, component requires consideration of: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* (citation omitted).

In order to consider frequency, we need to establish the relevant time frame. Plaintiff's incident happened on July 5, 2018, but he says that the harassment began on August 3, 2018, when he returned to work. [Doc. 49, p. 603]; [Doc. 57-2, ¶ 9]. From August 3, 2018, until August 14, 2018, Plaintiff documented what he perceived to be several instances of harassing behavior. *See, e.g.,* [Doc. 49, pp. 603–05]. Conceding that Plaintiff could likely establish frequency, he can't establish that the perceived harassment was severe or that it was even based on his age. *See Miller*, 277 F.3d at 1275.

"The Supreme Court has instructed that [the ADEA] is only implicated in the case of a workplace that is '*permeated* with *discriminatory* intimidation,'" *discriminatory* ridicule, and *discriminatory* insult. *Id.* at 1276–77 (emphasis added). Plaintiff's notes

indicate that Chief Moulton told him on several occasions he wanted him to retire, but these instances and most of the comments from his fellow firefighters simply weren't threatening or humiliating (and where one comment might have been humiliating, it wasn't based on Plaintiff's age). [Doc. 49, p. 603]. Plaintiff also reports that Assistant Chief Durham told him that "the shift commanders and Chief Moulton had met and they all want [him] to retire." [*Id.*]. Not only did Plaintiff endure several comments urging him to retire, but Assistant Chief Durham also raised his voice at him and told him that he "ought to be ashamed." [*Id.* at p. 604]. Ashamed of what? Obviously, Assistant Chief Durham didn't mean Plaintiff should be ashamed of his age, and the evidence doesn't support such a conclusion either. Sure, this single instance of being yelled at by a subordinate could be seen as humiliating, but as Plaintiff "would imagine," that comment was related to what happened at the fire scene—not his age. *Miller*, 277 F.3d at 1276; [Doc. 49, Wood Depo., p. 144:15–17]. Therein lies a critical distinction.

Sure, Chief Moulton and Assistant Chiefs Cannady, Renfroe, and Durham's retirement commentary may have been jammed into about ten workdays, but the evidence shows that none of it was "based on his protected characteristic"—an essential component of a hostile work environment claim. *Miller*, 277 F.3d at 1275. Based purely on Plaintiff's conduct from the night of the fire scene, Chief Moulton thought it would be better if Plaintiff left the City Fire Department "to protect his and the Department's

reputation." [Doc. 47-9, Moulton Decl., ¶ 15]. Assistant Chief Cannady's questions

about Plaintiff's intentions to stay with the City Fire Department didn't have anything

to do with Plaintiff's age. [Doc. 47-8, Cannady Decl., ¶ 4]. Rather, Assistant Chief

Cannady asked Plaintiff about his continued employment with the City Fire

Department because of Plaintiff's "conduct at the . . . fire scene." [*Id.*]; [Doc. 49, Wood

Depo., p. 136:5–21 (Plaintiff testifying that Assistant Chief Cannady never said that

Plaintiff should leave because of his age)]. What's more, the article that Assistant Chief

Renfroe showed to Plaintiff was merely a means to show Plaintiff "how other

individuals in similar situations handled themselves." [Doc. 47-11, Renfroe Decl., ¶ 4].

All things considered, perhaps this was not the best time to show Plaintiff that article,

but Assistant Chief Renfroe was clear that him showing it to Plaintiff "had nothing to

with his age[] and everything to do with his conduct at the . . . fire scene." [*Id.*]. Then,

when it comes to Assistant Chief Durham, he probably shouldn't have raised his voice

at Plaintiff (as evidenced by Chief Moulton's verbal admonition). [Doc. 47-7, Durham

Decl., ¶ 4]; [Doc. 47-9, Moulton Decl., ¶ 14]. Nevertheless, Assistant Chief Durham's

actions, improper as they may have been, "had nothing to do with [Plaintiff's] age."

[Doc. 47-7, Durham Decl., ¶ 4]. Again, the harassing conduct has to be based on

Plaintiff's age—his protected characteristic. *Miller*, 277 F.3d at 1275. And, here, it simply

wasn't.

　　　Assuming all of this somehow constituted actionable harassing conduct,

74

Defendants nonetheless took prompt, remedial action to correct it. *Id.* Silengo states that "[a]t no point during [her] discussion with [Plaintiff] did he tell [her] that he believed he was asked to leave the City [Fire Department] or retire because of his age." [Doc. 47-13, Silengo Decl., ¶ 3]. In fact, Plaintiff never mentioned age at all when he met with Silengo, and by her account, based on what Plaintiff told her, all of the retirement commentary had stopped. [*Id.* at ¶¶ 3–4].

Throughout what could reasonably be seen as frequent conduct, that conduct, for the most part, was not sufficiently severe or pervasive to alter the terms of his employment. *Miller*, 277 F.3d at 1276. But most importantly, it wasn't based on Plaintiff's age. *Id.* at 1275. Not only was the supposed harassing conduct not based on his age, but Plaintiff has also continued (and continues) to do his job with the City Fire Department.[25] Thus, for the reasons just discussed, Plaintiff does not have an actionable age-based hostile work environment claim. Accordingly, the Court **GRANTS** summary judgment to Defendants with respect to Plaintiff's hostile work environment claim set forth in Count Four of his Third Amended Complaint.

### 3.   Supplemental Jurisdiction

"Federal courts are courts of limited jurisdiction" and only possess "that power

---

[25] Notably, when you pull back from the nitpicky facts of this case, you'll notice that none of what Plaintiff perceived as harassing behavior started until after his incident. So, it wasn't that his age all of a sudden became a factor. His age was "there" long before July 5, 2018. That alone should be enough to show that the retirement commentary wasn't based on Plaintiff's age but instead on what Chief Moulton and Plaintiff's fellow firefighters saw as a lack of leadership and poor decision making from Plaintiff on the night in question.

authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511

U.S. 375, 377 (1994). Federal question jurisdiction is present in "all civil actions arising

under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A

district court will have original jurisdiction over civil actions filed by plaintiffs seeking

to redress any deprivation of a civil right afforded to them by the United States

Constitution or federal law. *See id.* at § 1343.

Federal courts may exercise supplemental jurisdiction over state law claims "in

any civil action of which the district courts have original jurisdiction." *Id.* at § 1367(a).

"District courts may decline to exercise supplemental jurisdiction over a claim" if "the

district court has dismissed all claims over which it has original jurisdiction." *Id.* at §

1367(c)(3). "[S]tate courts, not federal courts, should be the final arbiters of state law,"

and when a federal court "has dismissed all federal claims from a case, there is a very

strong argument for dismissal, especially where the federal claims are dismissed prior

to trial." *Ingram v. Sch. Bd. Of Miami-Dade Cnty.*, 167 F. App'x 107, 108 (11th Cir. 2006)

(quoting *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997)).

"[D]istrict courts may not exercise jurisdiction absent a statutory basis." *Exxon Mobil*

*Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).

The Court has now dismissed all federal claims in this action so that the

remaining claims involve only state law causes of action. Therefore, pursuant to the

discretion afforded the Court by 28 U.S.C. § 1367(c)(3), the Court **DECLINES** to exercise

supplemental jurisdiction over Plaintiff's remaining state law claims—his claim for intentional infliction of emotional distress; his claim for privacy violations and breaches of confidentiality related to O.C.G.A. § 34-9-415; and his claims for defamation, libel, and slander. [Doc. 33-1, pp. 40–45]. Accordingly, all of Plaintiff's state law claims against Defendants are **DISMISSED without prejudice**. Should Plaintiff wish to pursue these state law claims, he may commence a state-court action within 30 days. *See generally Artis v. District of Columbia*, 138 S. Ct. 594 (2018).

**CONCLUSION**

In accordance with the rulings discussed above, the Court **GRANTS** summary judgment to Defendants on Plaintiff's privacy-based Section 1983 claims; his discrimination and relation claims under the ADEA; his age-based hostile work environment claim; and his HIPAA claim, and it **DECLINES** to exercise supplemental jurisdiction over his remaining state law claims. Plaintiff's state law claims are **DISMISSED without prejudice**. The Clerk of Court is **DIRECTED** to **ENTER** Judgment accordingly and **CLOSE** this case.

**SO ORDERED**, this 31st day of March, 2022.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**